Jordan M. Rand (208671)
**KLEHR HARRISON**
**HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569 – 3024
jrand@klehr.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KWANSOO LEE, DDS, PLLC, BRIAN CHU, DDS, INC., VIA CRISTAL LIMITED PARTNERSHIP, MINT DENTAL CARE PLLC, SARASOTA DENTAL ARTS PLLC, WATER STATIONS LLC, 2021 PRESTIGE FUND Z, LLC, 10N, LLC, PAUL ETCHISON, JUNG J LEE WATERSTATION LLC, JUNG LEE, JOHN MIRANDA, individually and derivatively on behalf of PRESTIGE FUND A, LLC, PRESTIGE FUND A II, LLC, PRESTIGE FUND A IV, LLC, PRESTIGE FUND A V, LLC, PRESTIGE FUND A VI, LLC, PRESTIGE FUND D III, LLC, PRESTIGE FUND D V, LLC, PRESTIGE FUND D VI, LLC, | Case No. COMPLAINT |
| Plaintiffs, | |
| v. | |
| DAVID ZOOK, THE REAL ASSET INVESTOR, LLC, | |
| Defendants. | |

Plaintiffs Kwansoo Lee, DDS, PLLC, Brian Chu, DDS, Inc., Via Cristal Limited

Partnership, Mint Dental Care PLLC, Sarasota Dental Arts PLLC, Water Stations LLC, 2021

Prestige Fund Z, LLC, 10N, LLC, Paul Etchison, Jung J Lee Waterstation LLC, Jung Lee, and

John Miranda (collectively "Plaintiffs"), derivatively and on behalf of Prestige Fund A, LLC,

Prestige Fund A II, LLC, Prestige Fund A IV, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund D III, LLC, Prestige Fund D V, LLC, and Prestige Fund D VI, LLC (collectively "the Funds"), for their Complaint against David Zook and the Real Asset Investor, LLC, allege as follows:

## PARTIES

1.      Dr. Kwansoo Lee is a licensed dentist that works and resides in Washington.

2.      Kwansoo Lee, DDS, PLLC is a Washington professional limited liability company owned by Dr. Lee and a buyer of investments at issue herein.

3.      Dr. Brian Chu is a licensed dentist that works and resides in California.

4.      Brian Chu, DDS, Inc. is a California corporation owned by Dr. Chu and a buyer of investments at issue herein.

5.      Dr. Todd Auerbach is a licensed dentist that works and resides in California.

6.      Via Cristal Limited Partnership is an Arizona limited partnership, of which Dr. Auerbach is a general partner, and a buyer of investments at issue herein.

7.      Dr. Chase Funk is a licensed dentist that works and resides in Idaho.

8.      Mint Dental Care, PLLC is an Idaho professional limited liability company owned by Dr. Funk and a buyer of investments at issue herein.

9.      Dr. Kaya Aygen is a licensed dentist that works and resides in Florida.

10.     Kayamerica Dental, PLLC[1] is a Florida professional limited liability company owned by Dr. Aygen and a buyer of investments at issue herein.

11.     Dr. Raymond Jone is a licensed dentist that works and resides in California.

12.     Water Stations LLC is a California limited liability company owned by Dr. Jone and a buyer of investments at issue herein.

13.     Dr. Ryan Richard is a licensed dentist that works and resides in Georgia.

---

[1] Kayamerica Dental, PLLC was known as Sarasota Dental Arts, PLLC until May 16, 2023. Kayamerica Dental, PLLC bought the investments at issue herein as Sarasota Dental Arts, PLLC.

14.    2021 Prestige Fund Z, LLC is a Georgia limited liability company owned in part by Dr. Richard and a buyer of investments at issue herein.

15.    Dr. Paul Etchison is a licensed dentist that works and resides in Illinois.

16.    10N, LLC is an Illinois limited liability company owned by Dr. Etchison and a buyer of investments at issue herein.

17.    Dr. Jung Lee is a licensed dentist that works and resides in Washington.

18.    Jung J Lee Waterstation LLC is a Washington limited liability company owned by Dr. Lee and a buyer of investments at issue herein.

19.    John Miranda is a resident of Texas and a buyer of investments at issue herein.

20.    Prestige Fund A, LLC is a Pennsylvania limited liability company.

21.    Prestige Fund A II, LLC is a Pennsylvania limited liability company.

22.    Prestige Fund A, IV, LLC is a Delaware limited liability company.

23.    Prestige Fund A V, LLC is a Delaware limited liability company.

24.    Prestige Fund A VI, LLC is a Delaware limited liability company.

25.    Prestige Fund D III, LLC is a Delaware limited liability company.

26.    Prestige Fund D V, LLC is a Delaware limited liability company.

27.    Prestige Fund D VI, LLC is a Delaware limited liability company.

28.    David Zook is a resident of Pennsylvania. Zook has held various positions at Prestige Investment Group, including Principle, Fund Manager, and Executive Vice President of Development. Zook also owns The Real Asset Investor, LLC.

29.    The Real Asset Investor, LLC is a Wyoming limited liability company registered to do business as a foreign limited liability company in Pennsylvania.

## JURISDICTION AND VENUE

30.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, because Plaintiffs allege claims arising under the laws of the United States, and state claims which form part of the same case or controversy.

31.     The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because there is complete diversity and the amount in controversy exceeds $75,000.

32.     The Court has personal jurisdiction over Zook because he resides in Gap, Pennsylvania. The Court has personal jurisdiction over The Real Asset Investor because it maintains its principal place of business in Atglen, Pennsylvania.

33.     Venue is proper within this District pursuant to 28 U.S.C. § 1391 because Zook resides within the District.

## FACTUAL ALLEGATIONS

### *Zook and The Real Asset Investor*

34.     Zook has been an investment syndicator since at least as early as 2010.

35.     Syndicators manage groups of investors pooling their money to invest together.

36.     Syndicators charge a fee for their services but may also participate as investors.

37.     Zook's syndication ventures grew substantially over time, and he eventually became well known in some investment circles.

38.     In 2015, Zook founded The Real Asset Investor, LLC. The Real Asset Investor's website, www.therealassetinvestor.com, describes its business as follows:

The Real Asset Investor is an investment and syndication firm that focuses on providing high yield investment opportunities to its investors by partnering with best-in-class operators across a variety of asset classes.

The Real Asset Investor raises capital from accredited investors to acquire assets for cash flow, equity growth, tax benefits, and diversification, giving investors options outside of conventional financial markets. The firm's wide range of investment strategies and asset classes allow investors to find opportunities that are the best fit for their situation while also providing diversification for their portfolios.

39.     The Real Asset Investor's slogan, as shown below, emphasizes its niche offerings "outside of conventional financial markets":



40.     According to The Real Asset Investor's website, Zook "and his investors have invested across various asset classes since 2015," including investments in oil & gas, blockchain assets, self-storage, car washes, and multi-family & office parks.

41.     Investments promoted by Zook and The Real Asset Investor have at times been too unconventional, losing clients' money rather than serving as "high yield investment[s]."

42.     For instance, the "oil & gas" investment opportunity promoted by Zook and The Real Asset Investor involves the company Clean Energy Technology Association ("CETA").

43.     CETA represented to investors that it had patented technology and a deal to sell products to oil & gas giant ExxonMobil and promised sizable returns on investors' money. *See* Brett Sholtis, *ATM Investment Promoter Dave Zook Also Led Lancaster Investors to Texas Ponzi Scheme*, LancasterOnline (May 22, 2025), www.lancasteronline.com/news/local/atm-investment-promoter-dave-zook-also-led-lancaster-investors-to-texas-ponzischeme/article_e3772e61-b865-4062-a952-581623d74c67.html.

44.     CETA's representations turned out to be false. The U.S. Securities and Exchange Commission investigated and filed a complaint against CETA, alleging that it had defrauded its investors. Compl., *SEC v. Hill*, No. 6:23-cv-00321 (W.D. Tex. May 3, 2023).

45.     A receiver eventually took control of CETA's assets and determined that it was operating a Ponzi scheme. Status Report of Receiver, *SEC v. Hill*, No. 6:23-cv-00321 (W.D. Tex. July 31, 2023).

46.     CETA's investors lost around $181 million. Ex. F to Status Report of Receiver,

*SEC v. Hill*, No. 6:23-cv-00321 (W.D. Tex. Apr. 2, 2025).

47.    As one of CETA's promoters, Zook made a net profit of over $7 million. *Id.*

48.    Meanwhile, the investors which Zook brought to CETA through The Real Asset Investor collectively lost $8.7 million. *Id.*

*Prestige Investment Group*

49.    Daryl Heller founded Prestige Investment Group ("Prestige") in 2011.

50.    Prestige offered investors the opportunity to invest in the purchase and management of ATMs in exchange for a share of the revenue received from operation of those ATMs.

51.    Prestige partnered with another company, Paramount Management Group ("Paramount"), also founded by Heller, which managed the installation, operation, and maintenance of the ATMs which were the subject of Prestige's investments. A website pertaining to one of Prestige's investments, Prestige Fund D, www.prestigefundd.com, describes the ATM investment opportunity as follows:



52.    In 2016, Prestige had the opportunity to purchase an unusually large number of ATMs and needed additional help in managing the funding of those ATMs through money raised from outside investors.

53.    Heller, having heard of Zook's success as an investment syndicator, hired Zook

as one of Prestige's fund managers in late 2016.

54.    In promotional materials for its funds, Prestige promoted Zook as one of only four members of its core team:

# Our Team

   

Daryl F Heller CEO
Prestige Investment Group
Founder Paramount Mgt group

Will Powers
Fund Manager
Prestige Investment Group

Jorge Fernandez
Chief Development Officer
Paramount Management Group

Dave Zook CEO at RAI
Principle at Prestige Funds

55.    Zook played a key role in Prestige's growth, pushing for its expansion to allow it to bring in more investors, sometimes over the objection of other leaders at Prestige/Paramount.

56.    Zook eventually became responsible for the management of certain Prestige funds, including the ones Plaintiffs invested in.

57.    Zook managed his Prestige funds through The Real Asset Investor.

58.    For instance, The Real Asset Investor's employees sent subscription documents containing information about Prestige's investments to Plaintiffs. The Real Asset Investor's employees also gathered Plaintiffs' signatures on some of these documents, indicating their agreement to invest.

59.    The Real Asset Investor's employees also facilitated Plaintiffs' wiring of money in connection with their investments in Prestige.

*Zook's Representations about Prestige's Investments*

60.    Since 2016, Zook aggressively promoted Prestige's investments to attract new investors.

61.    As part of these promotional efforts, Zook made representations to potential investors about Prestige's investments, including Plaintiffs.

62.    In making these representations, Zook obligated himself to disclose to Prestige's investors additional material facts which he subsequently learned, which if left undisclosed would make his earlier representations false or misleading.

63.    In other words, Zook's representations to Prestige's investors created an ongoing duty of disclosure of related material facts.

64.    Zook's representations were made to potential investors at various times and places, and through different mediums.

65.    Prestige's management requested that Zook submit promotional materials pertaining to its investments to them for approval, but Zook often did not do so.

66.    At times, Prestige's management discovered promotional materials prepared and/or delivered by Zook which contained inaccuracies and/or misrepresentations. Prestige's management asked Zook to remove them and/or alter them to make them accurate.

67.    At some point, Prestige's management suggested to Zook that Prestige would shut his funds down if he continued to prepare and/or deliver inaccurate promotional material to recruit additional investors to Prestige.

68.    Zook asked at least one member of Prestige's management to join him in promotional efforts, but that member declined because they did not like the culture of The Real Asset Investor.

69.    One example of Zook's promotion is an online seminar hosted by him and The Real Asset Investor in 2022, which featured the slides below. The full presentation is attached to this complaint as Exhibit A and incorporated by reference.

## Investment Details

**Investment:** Diversified and growing Fund 2000 ATMs in 25 States

**Strategy:** Purchase in place ATMs and their contracts, upgrade, optimize and hold for cash flow

**Projected Hold Period:** 7 Years

**Locations:** All over the US with a focus on the North East

**Distributions:** Contractual fixed rate cashflow stream going to investors with manager receiving proceeds after and above that.

## Investment Details

- **ROI:** Projected annualized cashflow 24.5%
- **IRR:** Projected annualized IRR 18.6%
- **Distribution timing:** Paid monthly
- **Minimum Investment:** $52k
- **506c:** Accredited Investors Only

## Prestige Fund D

- Unique opportunity to invest in a Manager whose Portfolio Companies (including this Fund), are a top 5 owner and operator of ATMs in the U.S. with ATMs across 25 states.
- **The Portfolio Companies' portfolio is institutional quality both in size and average retailer location quality, as it has included ATMs located in many well-known retailers including Walgreens, McDonald's, Walmart, Sam's Club, Exxon, Sunoco, and Texaco, as well as many other Fortune 500 firms.**
- Prestige Investment Group, the Manager of this Fund, launched its first ATM fund in 2011. Since then, they have raised a total of more than $200 million of equity and have purchased or managed more than 10,000 ATMs.
- The contractual fixed-rate payments provide investors with a projected 24.5% cash-on-cash return, paid monthly, and an overall projected IRR of 18.6%.
- **Investors are projected to receive 100% of their initial investment back within approximately four years, creating a significant reduction in risk, particularly related to technology disruption.**
- Despite the outsized projected returns, the Fund will not use any leverage (debt financing), thus reducing the investment's risk profile.

ATM Business
Model #3
With Prestige

- PMG acquires large portfolio's of Institutional grade ATMs

- Acquisitions range from $1M-$25M

- PMG brings ATM portfolio to Prestige

- PMG manages ATMs for Prestige

- PMG shares in the revenue with Prestige

- Prestige funds acquisition through capital raise with its investors

- Investors get a portion of the revenue paid monthly

70.    Potential investors were also provided with documents summarizing Prestige's investments, excerpts of which are shown below. The full document is attached to this complaint as Exhibit B and incorporated by reference.



**ATM MODEL OVERVIEW**

Our core strategy is to participate in the mature and stable ATM space that has historically demonstrated strong operating margins. By accessing attractive real estate locations for ATMs, we also strategically position for capitalizing on next generation revenue opportunities through advertising monetization of ATM assets/location, thereby augmenting the core healthy surcharge operating margins.

*ATM Ownership...* PFD VI owns the ATM assets and out-sources the placement and management of ATMs to a qualified, third-party management company through "best in class" negotiated commercial agreements. These types of contracts have been historically owned and controlled by private equity or hedge funds that are attracted to this sector due to ATMs strong operating margins, and the tangible collateral of the hard-asset title to the ATM. A third-party management company may be an affiliate of PFD VI or its affiliates.

*Collateral/Security/Risk Management...* The investment is backed with a hard asset (ATM Title) that has long usable life cycles. Additionally, we have negotiated assignment of the location agreements (where ATM is placed) in the event of a default by a management company we have contracted which have substantial market valuation thereby mitigating risk.

*ATM Deployment Cycles...* Deployment cycles generally take 65-75 days until ATMs are installed and operational at retail merchant location and will play out as follows. Capital is wired to the management company we contract on or around the 20th of each month. ATMs are then procured and shipped to warehouse by the management company. ATMs are then staged (upgraded to bank standard vaults, wraps installed, programmed for user options, implemented with monetization technology, etc.). ATMs are then shipped to a geo-specific warehouse where the installation company will pick up to install. Subsequent to installation, PFD VI receives Bill of Sales inclusive of an ATM's serial number.

### How soon after I invest do my distributions start?

ATM orders get turned in around the 15th of each month, from that day forward we have 75 days to order your machines and place them in service. The first full month after that is when your machines are producing and building cashflow, you will then receive an email on the 25th day of the following month with your investor statement and notification that a deposit has been made into your account via ACH. If the 25th is on a weekend this process will be delayed until the following Monday. It's therefore best to assume that there will be an approximate 4 month delay between when you invest and when you will receive your first distribution.

### What happens if an ATM stops performing as well as it should?

The management company will go in, remove the machine and put it in a new location at no charge to the investor and there will be no lapse or reduction in the distribution amount. Remember you are in a blended pool with more than 1000 other ATMs and you are receiving a blended return.

### How does an investor get paid? Percentage of profit? Percentage of fees?

Our management company commits to each investor that each unit ($104,000 investment) is projected to receive $2,162 per month. Investors get paid on a blended performance of the entire fund and in the rare occasion that the fund performance is lagging, management will share their portion of the revenue to bring the distribution up to the proforma amount. In the event that the fund over performs, management retains the revenue above the fixed investor return.

71.    Zook also promoted Prestige's investments through The Real Asset Investor's online connections.

72.    In a podcast dated September 1, 2020, available at www.lisahylton.com/investing-in-atms-earn-double-digit-returns-with-dave-zook, Zook stated that "we took the volatility out of ATM investing. . . . There are months when you may make 3,200 transactions and then we'll kick in our portion of the surcharge revenue, bring you up where you should be. . . . We're well aligned with the investor . . . it's given a nice consistent return to investors they can count on every month." Zook also stated that Prestige's investors' money would be used to purchase specific ATMs.

73.    In another podcast dated February 1, 2022, available at www.youtube.com/watch?v=eb7XRcI2JLI, Zook stated that Prestige's investors would be paid a "24 and a half percent . . . fixed return" on Prestige's investments which "would not go up or down." Zook further explained, in instances where one of Prestige's investments returned less than the guaranteed rate of return, Prestige's management would "chip in our portion of the surcharge revenue," creating a "floor underneath" the guaranteed rate of return. Zook also noted that in acting as an investment syndicator he was "aligned with his investor" and would not get paid "a dime" until his investors got "100% of their return."

*Plaintiffs' Investments in Prestige*

74.    Prior to investing with Prestige, Plaintiffs each reviewed materials promoting Prestige's investments containing representations made directly by or attributable to Zook.

75.    Although the exact wording of those materials varied, they all contained materially similar representations and assurances about Prestige's investments, including that:

(a)    Money invested in Prestige would be used to purchase ATMs.

(b)    In return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution.

(c)     The value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige.

(d)     Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

76.     Plaintiffs reasonably assumed the information they had been given about Prestige's investments via these representations had been vetted and was accurate.

77.     In reliance on Zook's representations and assurances, Plaintiffs invested in Prestige in the amounts shown on the next page:

| Plaintiff | Investment Date(s) | Prestige Fund(s) Invested In | Total Amount Invested |
|---|---|---|---|
| Kwansoo Lee, DDS, PLLC | 9/28/2020 | Prestige Fund D III, LLC | $1,764,000 |
| | 8/30/2021 | Prestige Fund A II, LLC | |
| | 12/21/2021 | Prestige Fund A V, LLC | |
| | 5/24/2022 | Prestige Fund A V, LLC | |
| Brian Chu, DDS, Inc. | 8/25/2021 | Prestige Fund A II, LLC | $1,040,000 |
| | 11/13/2022 | Prestige Fund A IV, LLC | |
| Via Cristal Limited Partnership | 12/29/2018 | Prestige Fund A, LLC | $208,000 |
| | 12/26/2023 | Prestige Fund D VI, LLC | |
| Mint Dental Care PLLC | 5/31/2023 | Prestige Fund D V, LLC | $208,000 |
| Sarasota Dental Arts PLLC | 4/9/2022 | Prestige Fund A V, LLC | $364,000 |
| | 8/19/2022 | Prestige Fund A VI, LLC | |
| Water Stations LLC | 7/28/2021 | Prestige Fund A II, LLC | $1,768,000 |
| | 11/29/2021 | Prestige Fund A V, LLC | |
| | 4/14/2022 | Prestige Fund A V, LLC | |
| | 10/7/2022 | Prestige Fund A VI, LLC | |
| 2021 Prestige Fund Z, LLC | 11/29/2021 | Prestige Fund A V, LLC | $3,952,000 |
| 10N, LLC / Paul Etchison | 1/14/2021 | Prestige Fund D, IV, LLC | $728,000 |
| | 5/12/2022 | Prestige Fund D V, LLC | |
| Jung J Lee Waterstations LLC / Jung Lee | 8/20/2021 | Prestige Fund A II, LLC | $624,000 |
| | 11/17/2022 | Prestige Fund A VI, LLC | |
| John Miranda | 2/15/2022 | Prestige Fund D V, LLC | $1,144,000 |
| | 4/1/2022 | Prestige Fund D V, LLC | |
| | 8/22/2022 | Prestige Fund D V, LLC | |
| **Total Invested by Plaintiffs:** | | | **$11,800,000** |

*Prestige Stops Paying its Investors*

78.     Prestige paid monthly distributions to Plaintiffs through early spring 2024.

79.     On April 29, 2024, Prestige announced it would immediately begin paying distributions on a quarterly, rather than the promised monthly, basis.

80.     Prestige announced and justified the change in an email from Heller to Prestige's investors. Heller's email also stated that Zook had been part of conversations surrounding the change to quarterly payments.

81.     In his email, Heller gave only innocuous reasons for the change:

Why are we making the change to quarterly distribution payments?
- Affords opportunity to balance and better account for monthly seasonality impacts
- Provides better alignment on operating cash flow monthly variances
- Better alignment with revenue timing and true ups on payments received from operating vendor/supplier partners
- Significantly reduces administrative costs monthly

82.     Heller's email did not indicate anything was wrong with Prestige's or Paramount's financial condition, or that Prestige's investments were in peril.

83.     On May 7, 2024, Zook emailed the Prestige investors who he managed the investments of, including Plaintiffs, following up on Heller's April 29 email:

Last week, you received an announcement that the ATM Fund model has been altered from a monthly to a quarterly distribution.

Since that email was distributed, we have received quite a bit of investor feedback and questions.

In the interest of transparency and efficiency, we thought it would be best for Prestige CEO Daryl Heller to address the common questions, themes, and, in some cases, misconceptions in a webinar recording.

We plan on sending out this recording within the next 24 hours.

Thank you,






Dave Zook
Investment and Tax Strategist
5075 Lower Valley Road, Atglen, PA 19310
Phone: 717-278-2456   Fax: 610-593-7710
Website: www.therealassetinvestor.com

"For God has not given us a spirit of fear, but of power and of love and of a sound mind."
- II Timothy 1:7

THE REAL ASSET INVESTOR

#1 Best Selling Author

84.     Zook's email, like Heller's, did not indicate anything was wrong with Prestige's or Paramount's financial condition, or that Prestige's investments were in peril.

85.     Prestige did not pay its investors another distribution following the change to quarterly payments.

86.     In July 2024, Zook began emailing the Prestige investors who he managed the investments of, including Plaintiffs, about actions his legal team was taking against Heller and Paramount.

87.     Zook's emails stated his legal team was "working on behalf of all our ATM investors" and that "we are fully prepared to fight on behalf of our investors."

88.     Zook's emails also stated it was "important to reiterate that I, Dave Zook, hold zero equity ownership in Paramount Management Group."

89.     Zook's emails made no mention of any equity ownership he had in Prestige or its funds.

90.     In November 2024, Zook emailed the Prestige investors who he managed the investments of, including Plaintiffs, and stated regarding ongoing legal proceedings "our objective is clear: recovery of your investment" and that "[f]rom the time we started the litigation process our #1 goal has always been to bring our investors to safety and to put you in the best position possible, we will continue to fight for you."

*Prestige and Paramount are Unveiled as a Ponzi Scheme*

91.     In late 2024 and early 2025, Prestige and Paramount began to fully collapse, and the true nature of their operation was uncovered.

92.     Prestige's various funds sued Paramount, demanding payment of past due distributions. *See Prestige Fund A, LLC, et al. v. Paramount Management Group, LLC*, No. CI-24-06012 (Pa. Ct. Com. Pl. Aug. 23, 2024) (the "Prestige Fund Action").

93.     The FBI raided Paramount's offices in December 2024. Chad Umble, *FBI Agents Appear at Office of Lancaster-based ATM Network that Owes $138M to Investors,*

LancasterOnline (Dec. 5, 2024), www.lancasteronline.com/news/local/fbi-agents-appear-at-offices-of-lancaster-based-atm-network-that-owes-138m-to-investors/article_85a7f7f6-b321-11ef-9090-9f2ab795cd69.html.

94.     Heller declared bankruptcy in February 2025. *In re Heller*, No. 1:25-bk-11354 (JNP) (Bankr. D.N.J. Feb. 11, 2025).

95.     Ongoing litigation in the Prestige Fund Action and other cases relating to Prestige's investments is revealing what was going on behind the scenes at Prestige and Paramount, unbeknownst to Plaintiffs.

96.     Heller was operating Paramount and Prestige as part of a Ponzi scheme and misappropriating money associated with each, by paying investors or other parties through money from new investors, rather than through ongoing legitimate business activity.

97.     According to Randall Leaman, a Paramount executive who held various titles, Heller began misappropriating Paramount's operating revenue, which should have been used to pay Paramount's operating costs and Prestige's investors, at least as early as the second quarter of 2024. April 27, 2025 Dep. Test. of Randall Leaman, Doc 203-1, pp. 62:22-63:12, Prestige Fund Action.

98.     Heller used Paramount's operating revenue to "pay payroll at Heller Capital and an unrelated restaurant." *Id.* at 64:1-65:2.

99.     Heller also used Paramount's operating revenue to pay loans Heller had taken out, the purposes of which were unknown to Leaman. *Id.* at 66:7-19.

100.    Moreover, the ATMs which Zook promised would be purchased with Prestige's investments, and which served as collateral to payments due by Prestige's investors, were not actually purchased.

101.    From 2017 to 2024, Paramount should have purchased more than 38,000 ATMs based on the quantity of investments in Prestige.

102.    Bills of sale purporting to evidence the purchase of around 36,000 ATMs by

Paramount between 2017 and 2023 contained only placeholder ATM serial numbers, which were not traceable to any specific ATM.

103.    No bills of sale were provided by Paramount for ATM purchases in 2024.

104.    Paramount's internal records show the most ATMs it ever managed was 17,266 in August 2023.

105.    Finally, Zook and other Prestige executives paid themselves before Plaintiffs received their guaranteed distributions, contrary to representations Zook made in promoting Prestige's investments.

106.    Prestige's executives, including Zook, collectively paid themselves around $75.6 million in connection with the operation of Prestige's investments from 2020 through March 2024, while Prestige's investors have lost millions in connection with their investments in Prestige.

107.    During the same period, Zook, directly or through The Real Asset Investor, was paid approximately $42.7 million in connection with Prestige.

108.    Zook and others at Prestige have also misappropriated revenue generated from ATMs since on or about November 2024 to pay legal fees and other unauthorized expenses rather than using that money to pay overdue guaranteed distributions to Prestige's investors.

109.    As of this filing, Plaintiffs have lost significant amounts of money in connection with their investments in Prestige, as shown on the next page.

| Plaintiff | Total Investment Amount | Total Distributions Received | Difference |
|---|---|---|---|
| Kwansoo Lee, DDS, PLLC | $1,764,000 | $824,652 | -$939,348 |
| Brian Chu, DDS, Inc. | $1,040,000 | $76,813 | -$963,187 |
| Via Cristal Limited Partnership | $208,000 | $136,074 | -$71,926 |
| Mint Dental Care PLLC | $208,000 | $76,813 | -$131,187 |
| Sarasota Dental Arts PLLC | $364,000 | $127,020 | -$236,980 |
| Water Stations LLC | $1,768,000 | $658,783 | -$1,109,217 |
| 2021 Prestige Fund Z, LLC | $3,952,000 | $2,116,296 | -$1,835,704 |
| 10N, LLC / Paul Etchison | $728,000 | $392,112 | -$335,888 |
| Jung J Lee Waterstation LLC / Jung Lee | $624,000 | $211,105 | -$412,895 |
| John Miranda | $1,144,000 | $468,812 | -$675,188 |
| **Total Loss of Plaintiffs:** | | | **-$6,711,520** |

*Zook's Knowledge of Undisclosed Material Facts*

*Related to Plaintiffs' Investments in Prestige*

110.    As explained above, Zook's representations to Prestige's investors created an ongoing duty of disclosure of related material facts to make those representations accurate.

111.    Subsequent to making those representations, Zook had access to and was actually aware of material facts which made these representations false or misleading yet failed to disclose those material facts to Plaintiffs.

112.    Zook received, and thus knew about, the lion's share ($42.7 million) of the excessive $75.6 million in compensation collected by Prestige's management and was receiving payments of these fees before and after Plaintiffs invested in Prestige. He did not disclose this fact to Plaintiffs.

113.    Payments of such exorbitant fees endangered Prestige's ability to pay its investors guaranteed, fixed rate, monthly distributions.

114.    Moreover, payments of such exorbitant fees in light of the fact that Prestige eventually could not pay its investors any distributions beginning in the second quarter of 2024 meant that Zook and Prestige's executives were, contrary to earlier representations, paid before Prestige's investors were paid their guaranteed, fixed rate, monthly distributions through the end of their investments.

115.    In addition, Zook, as part of the leadership of Prestige, was or should have been aware that bills of sale purporting to evidence the purchase of around 36,000 ATMs by Paramount between 2017 and 2023 contained placeholder serial numbers which were not traceable to any specific ATM.

116.    Zook was or should have been similarly aware that Paramount had not purchased the more than 38,000 ATMs that they should have given the quantity of investments in Prestige.

117.    In other words, Zook was or should have been aware, at least as early as 2017, that contrary to earlier representations, money invested in Prestige was not being used to purchase ATMs, and thus that ATMs and any contracts related to those ATMs were not serving as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors.

118.    Finally, as explained above, Heller began misappropriating Paramount's operating revenue and operating Prestige and Paramount as a Ponzi scheme at least as early as the second quarter of 2024.

119.    Zook was or should have been aware of Heller's misconduct with respect to

Prestige and Paramount since at least as early as on or around December 2023. As part of the Prestige Fund Action, Zook swore that he "routinely" spoke with Heller in regard to Prestige and Paramount. August 22, 2024 Affidavit of Dave Zook, Exhibit 16 to Plaintiffs' Petition for Special Injunction and Preliminary Injunction, p. 2, Prestige Fund Action.

120.    On or around December 2023, Zook and The Real Asset Investor stopped seeking additional investors for Prestige and sought additional information about Prestige's investments, including audited financial information regarding Paramount, from Heller.

121.    Zook had apparently been asking Heller for audited financial information related to Paramount up to 18 months prior to when Prestige stopped paying investors in spring 2024. Zook did not disclose this fact to Prestige's investors, including Plaintiffs.

122.    Heller refused to provide this information to Zook.

123.    Instead, Heller only provided Zook with a letter from Paramount's accountant, rather than a third-party auditor, about Paramount.

124.    Despite any suspicions he had about Heller, Paramount, and Prestige's investments, Zook continued to accept additional investments from current investors, including Mr. Auerbach, until at least as late as December 26, 2023.

125.    Around the same time, Zook became aware that Paramount was relying on third-party financing to fund the acquisition of ATMs, which indicated that Prestige investor money was being used for some purpose other than buying ATMs.

126.    Moreover, in mid-April 2024, texts between Heller and one of Paramount's executives mentioned above, Randall Leaman, indicate that Zook again asked Heller for more information about Paramount and/or Prestige's financials.

127.    Heller responded to Leaman that he was providing Zook with only high-level information and that if Zook texted Leaman that Leaman should ignore Zook. Zook did not disclose this fact to Prestige's investors, including Plaintiffs.

128.    Finally, as detailed above, Zook was part of the conversation related to Prestige's

changes to quarterly, rather than monthly, payments and was aware or should have been aware that the innocuous reasons Heller gave for the change were false.

129.    These material facts known to Zook made his earlier representations to Plaintiffs false or misleading.

130.    These materials facts known to Zook were not known by Plaintiffs nor disclosed to Plaintiffs by Zook.

131.    Plaintiffs would not have invested in Prestige had these and other material facts been fully disclosed by Zook.

132.    Unbeknownst to Plaintiffs, Zook recommended that they invest in Prestige despite the fact that the investment was unsuitable for them given their specific financial goals and circumstances, despite the nature of the risks of the investment including the consequences to them personally in the event they suffered a total loss, and the true financial condition of Prestige and Paramount and the securities at issue.

133.    Zook had superior access to information about Prestige and Paramount and knew or should have known that the investments were not suitable for Plaintiffs.

134.    Zook failed to conduct adequate due diligence before recommending that Plaintiffs invest in Prestige and/or misrepresented the nature and safety of the investments to generate more profits.

135.    Zook failed to monitor Plaintiffs' investments and otherwise act in Plaintiffs' best interests, both before and after Plaintiffs made their investments.

136.    Zook's misrepresentations and omissions created a false sense that the investments in Prestige were far safer and more secure than what was actually the case which caused Plaintiffs to invest.

137.    At all relevant times, Plaintiffs reasonably and justifiably relied on Zook to fulfill his fiduciary duties in connection with his recommendation that Plaintiffs invest in Prestige.

138.    Plaintiffs were thus not aware of the nature of the financial risks they were being exposed to or Zook's lack of due diligence.

## DERIVATIVE ALLEGATIONS

139.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

140.    Plaintiffs assert some of their claims derivatively on behalf of the Funds to redress injuries suffered, or to be suffered, by the Funds as a direct result of the Zook's actions.

141.    Plaintiffs will adequately and fairly represent the interests of the Funds in enforcing and prosecuting their rights.

142.    Plaintiffs have been members of the Funds, as set forth above, continuously during the time of the wrongful conduct alleged herein and continue to be members of the Funds.

143.    A pre-suit demand on the Boards of Managers of the Funds to institute this action would be useless and futile and is therefore excused as a matter of law.

144.    The Funds are manager-managed, not member-managed, by two limited liability companies, both of which Zook and Heller collectively maintain a majority and thus controlling interest in through their companies The Real Asset Investor and Heller Capital Group, LLC, respectively.

145.    Demand is excused as to Zook and Heller because each of them faces a substantial likelihood of personal liability by reason of the conduct alleged herein. Both Zook and Heller directly authorized, permitted, disregarded, and/or took no steps to prevent the conduct alleged herein, proximately causing substantial losses to the Funds. As a result, Zook and Heller are unable to impartially investigate the conduct and decide whether to pursue action against themselves.

146.    The Funds have been and will continue to be exposed to significant losses due to the conduct alleged herein, yet Zook and Heller have not filed any lawsuits against

themselves, individually or collectively, to recover damages for all or part of the harm the Funds have suffered and will continue to suffer.

147.    Under these circumstances, Zook and Heller, as controlling members of the Funds' managers, cannot be expected to bring the claims asserted herein and cannot fully and fairly prosecute such a suit even if they brought one. Demand is therefore excused.

## CAUSES OF ACTION

### COUNT 1

**BREACH OF FIDUCIARY DUTY**

**(Plaintiffs on behalf of the Funds against Zook)**

148.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

149.    As the owner of one of two controlling members of the Funds' managers, Zook owed a fiduciary to the Funds.

150.    Zook breached his fiduciary duty to the Funds by engaging in acts or omissions including:

> (a)    Managing the Funds' assets for his excessive personal gain by diverting to himself nearly $42.7 million in fees, which should have and could have been used for the benefit of the Funds, by allowing the Funds to operate as intended and pay guaranteed monthly distributions to the Funds' investors.

> (b)    Misappropriating revenue generated from ATMs from on or about November 2024 to pay legal fees and other unauthorized expenses, which should have and could have been used for the benefit of the Funds, by allowing the Funds to operate as intended and pay guaranteed monthly distributions to the Funds' investors.

(c)     By failing to ensure that ATMs which were promised to be purchased with investments in the Funds and placed in the Funds' names were actually purchased, which devalued the Funds.

(d)     Otherwise engaging in grossly negligent or more culpable acts or omissions have devalued the Funds.

151.    As a direct and proximate result of Zook's breaches of his fiduciary duties to the Funds, the Funds have incurred damages.

152.    Plaintiffs, on behalf of the Funds, have no adequate remedy at law.

## COUNT 2

### BREACH OF FIDUCIARY DUTY

### (Plaintiffs against Zook)

153.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

154.    At all relevant times, Zook was an "investment adviser" within the meaning of 15 U.S.C. § 80b-2(a)(11) because Zook was in the business of directly and/or indirectly providing advice about investments for compensation, through his work at The Real Asset Investor and Prestige.

155.    Zook held himself out as experienced investment advisor that could help Plaintiffs safely invest to secure their financial freedom.

156.    Zook had superior knowledge, expertise, and skills about investing that Plaintiffs lacked.

157.    Plaintiffs trusted and relied upon Zook to act in their best interests.

158.    Under applicable law, Zook owed fiduciary duties of utmost good faith, loyalty, and care to Plaintiffs, before and after Plaintiffs invested, including, but not limited to, (a) to act in Plaintiffs' best interests and not to act in his own interest to the detriment of Plaintiffs; (b) to recommend investment opportunities that were suitable and secure; (c) to

carry out adequate due diligence before providing investment advice; and (d) to disclose all material information related to the risks of the particular investments he recommended to Plaintiffs.

159.    Zook breached his fiduciary duties to Plaintiffs by, among other things, (a) failing to recommend investments to Plaintiffs that suited Plaintiffs' circumstances and goals; (b) failing to act in Plaintiffs' best interests and failing to refrain from acting in his own interest to the detriment of Plaintiffs; (c) misrepresenting the nature and risks of Prestige's investments to Plaintiffs, and/or failing to carry out adequate due diligence about those investments and/or Prestige's and Paramount's financial condition; and (d) failing to disclose all material information about Prestige and Paramount before and after Plaintiffs invested.

160.    Zook's breaches of his fiduciary duties to Plaintiffs are continuing and constitute a continuing tort.

161.    Zook's breaches concealed from Plaintiffs the true nature of their claims against him.

162.    As a direct and proximate result of the above breaches, Plaintiffs have been damaged in an amount to be proven at trial, for which Zook is liable.

## <u>COUNT 3</u>

### NEGLIGENT MISREPRESENTATION AND OMISSION

#### (Plaintiffs against Zook and The Real Asset Investor)

163.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

164.    Plaintiffs invested in Prestige based on negligent misrepresentations and omissions of material facts made by Zook.

165.    At all times relevant to this Complaint, Plaintiffs reasonably believed that Zook had the authority to act on behalf of The Real Asset Investor. As such, Zook's statements are imputed to The Real Asset Investor.

166.    In recommending investing in Prestige to Plaintiffs, Zook's statements and omissions were material to Plaintiffs' decisions to invest, and maintain their investments, in Prestige.

167.    Zook's misrepresentations and omissions of material fact include, but are not limited to, that (a) money invested in Prestige would be used to purchase ATMs; (b) in return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution; (c) the value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige; and (d) Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

168.    Zook failed to take the steps necessary to ensure his representations were correct.

169.    Zook was in a superior position to know whether his representations were correct and knew or should have known his representations were incorrect.

170.    Plaintiffs were entitled to rely, and did so reasonably, on Zook's representations with respect to investing in Prestige.

171.    Plaintiffs were ignorant of the falsity of Zook's representations.

172.    As a direct and proximate result of the above Plaintiffs have been damaged in an amount to be proven at trial, for which Zook and The Real Asset Investor are liable.

## <u>COUNT 4</u>

**VIOLATIONS OF THE FEDERAL SECURITIES EXCHANGE ACT**

**(Plaintiffs against Zook and The Real Asset Investor)**

173.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

174.    Plaintiffs' investments in Prestige constituted securities under applicable federal

law.

175.    At all times relevant to this Complaint, Plaintiffs reasonably believed that Zook had the authority to act on behalf of The Real Asset Investor. As such, Zook's statements are imputed to The Real Asset Investor.

176.    Pursuant to Section 10(b) of the Securities Exchange Act and Rule 10(b)(5) promulgated thereunder, all material facts in connection with the offer and sale of securities must be disclosed.

177.    Zook, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of the means of interstate commerce, knowingly and/or recklessly made untrue statements of material fact and knowingly and/or recklessly omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in an act, practice, or course of business that would operate a fraud or deceit on another person.

178.    As alleged herein, in recommending that Plaintiffs invest in Prestige, and facilitating their investment, Zook violated the Securities Exchange Act by making material misrepresentations and omissions in connection with Plaintiffs' investments in Prestige.

179.    Zook's misrepresentations and omissions of material fact include, but are not limited to that (a) money invested in Prestige would be used to purchase ATMs; (b) in return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution; (c) the value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige; and (d) Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

180.    Zook acted knowingly or recklessly in that, among other things, he failed to ascertain and disclose the true facts to Plaintiffs even though those facts were available to

him.

181.    Plaintiffs actually and justifiably relied upon the statements and omissions made by Zook in investing in Prestige and maintaining their investments in Prestige.

182.    Zook's acts and omissions constituted an extreme departure from the applicable standard of care.

183.    Zook profited from such conduct through his interests in Prestige, whether directly or indirectly The Real Asset Investor.

184.    Zook was in a superior position to know whether his representations were correct and knew or should have known his representations were incorrect.

185.    Zook and The Real Asset Investor additionally illegally operated as unregistered broker-dealer, which Zook failed to disclose.

186.    As a direct and proximate result of the above Plaintiffs have been damaged in an amount to be proven at trial, for which Zook and The Real Asset Investor are liable.

## <u>COUNT 5</u>

### VIOLATIONS OF THE PENNSYLVANIA SECURITIES ACT

#### (Plaintiffs against Zook and The Real Asset Investor)

187.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

188.    Zook is a resident and conducts business in Pennsylvania.

189.    The Real Asset Investor is registered to and in fact conducts business in Pennsylvania.

190.    At all times relevant to this Complaint, Plaintiffs reasonably believed that Zook had the authority to act on behalf of The Real Asset Investor. As such, Zook's statements are imputed to The Real Asset Investor.

191.    Plaintiffs' investments in Prestige constituted securities under applicable state law.

192.    Pursuant to Section 1-401 of the Pennsylvania Securities Act of 1972, 70 P.S. § 1-401, it is unlawful to, in connection with the offer, sale, or purchase of any security, (a) employ and device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

193.    Zook, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security in Pennsylvania, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

194.    As alleged herein, in recommending that Plaintiffs invest in Prestige, and facilitating their investment, Zook, individually and/or through The Real Asset Investor violated the Pennsylvania Securities Act by making material misrepresentations and omissions in connection with Plaintiffs' investments in Prestige.

195.    Zook's misrepresentations and omissions of material fact include, but are not limited to that (a) money invested in Prestige would be used to purchase ATMs; (b) in return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution; (c) the value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige; and (d) Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

196.    Zook acted knowingly or recklessly in that, among other things, he failed to

ascertain and disclose the true facts to Plaintiffs even though those facts were available to him. Plaintiffs actually and justifiably relied upon the statements and omissions made by Zook in investing in Prestige and maintaining their investments in Prestige.

197.    Zook's acts and omissions constituted an extreme departure from the applicable standard of care. Zook profited from such conduct through interests in Prestige, whether directly or indirectly through The Real Asset Investor.

198.    Zook was in a superior position to know whether his representations were correct and knew or should have known his representations were incorrect.

199.    Zook and The Real Asset Investor additionally illegally operated as broker-dealers and/or Plaintiffs' investment advisor or agent without proper registration in Pennsylvania, in violation of 70 P.S. § 1-301, and failed to disclose this fact.

200.    Zook's actions render him liable for civil damages under 70 P.S. § 1-501, either directly as a person who offers or sells securities or through joint and several liability under 70 P.S. § 1-503 as a person who materially aided in the act or transaction constituting a violation of 70 § 1-501.

201.    As a direct and proximate result of Zook's various violations alleged herein, Plaintiffs have been damaged in an amount to be proved at trial, for which Zook is liable.

202.    Plaintiffs are entitled to all rights and remedies provided under Pennsylvania law and Title 70 P.S. Ch. 1.5 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests the Court award the following relief:

A.    For an award of damages against Zook and The Real Asset Investor, jointly and severally, for Plaintiffs' claims in an amount and of a nature to be determined at trial;

B.    For statutory damages as available and applicable in such amount as the Court deems just and proper, including but not limited to treble, exemplary, and/or punitive damages;

C.    For prejudgment interest on any portion of the damages award that is for a

liquidated amount;

     D.     For attorneys' fees and costs of litigation; and

     E.     For further relief as the Court deems just, equitable, or warranted by law.

By: /s/ Jordan Rand_____
Jordan M. Rand (208671)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Phone: (215) 569-3024
Facsimile: (215) 568-6603
Email: jrand@klehr.com

**K&L GATES LLP**
John T Bender, WSBA No. 49658 (*pro hac vice to be filed*)
Aidan D. McCarthy, WSBA No. 63808 (*pro hac vice to be filed*)
925 4th Avenue, Suite 2900
Seattle, WA 98104
Phone: 206-623-7580
Facsimile: 206-623-7022
Email: john.bender@klgates.com

*Attorney for Plaintiffs*

Date: August 22, 2025