Jordan M. Rand
PSBA No. 208671
**KLEHR HARRISON
HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569 – 3024
jrand@klehr.com
*Attorneys for Plaintiffs*

John T Bender
WSBA No. 49658 (*pro hac vice*)
Aidan D. McCarthy
WSBA No. 63808 (*pro hac vice*)
**K&L GATES LLP**
925 4th Avenue, Suite 2900
Seattle, WA  98104
206-623-7580
john.bender@klgates.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KWANSOO LEE, DDS, PLLC, BRIAN CHU, DDS, INC., VIA CRISTAL LIMITED PARTNERSHIP, MINT DENTAL CARE PLLC, SARASOTA DENTAL ARTS PLLC, WATER STATIONS LLC, 10N, LLC, PAUL ETCHISON, JUNG J LEE WATERSTATION LLC, JUNG LEE, JOHN MIRANDA, and NICHOLAS GELLER individually and derivatively on behalf of PRESTIGE FUND A II, LLC, PRESTIGE FUND A V, LLC, PRESTIGE FUND A VI, LLC, PRESTIGE FUND D III, LLC, PRESTIGE FUND D IV, LLC, PRESTIGE FUND D V, LLC, PRESTIGE FUND D VI, LLC, | Case No. 2:25-CV-04842-JLS |
| Plaintiffs, | |
| v. | |
| DAVID ZOOK, THE REAL ASSET INVESTOR, LLC, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiffs Kwansoo Lee, DDS, PLLC, Brian Chu, DDS, Inc., Via Cristal Limited Partnership, Mint Dental Care PLLC, Sarasota Dental Arts PLLC, Water Stations LLC, 10N, LLC, Paul Etchison, Jung J Lee Waterstation LLC, Jung Lee, John Miranda, and Nicholas Geller (collectively "Plaintiffs"), individually and derivatively and on behalf of Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, and Prestige Fund D VI, LLC (collectively "the Funds"), for their First Amended Complaint against David Zook and the Real Asset Investor, LLC, allege as follows:

## NATURE OF ACTION

1.      This action arises from a multi-year scheme in which Defendants David Zook ("Zook") and The Real Asset Investor, LLC ("The Real Asset Investor" or "RAI") promoted, offered, and sold investments in a series of Prestige Funds tied to automated teller machines ("ATMs"). Defendants represented—repeatedly and uniformly—that investor capital would be used to purchase specific ATMs owned by the Funds; that investors would receive guaranteed, fixed monthly distributions funded by surcharge revenue; that any variability would be borne by the manager; and that investors' interests were secured by the value of owned ATMs and related contracts.

2.      Those representations were false or misleading when made and/or became false as Defendants learned material facts they failed to disclose, including that investor funds were not used to acquire the represented number of ATMs, that serial numbers were duplicated, that receipts from ATM operations were insufficient to pay investor returns, and that management—including Zook and entities he controlled—paid themselves tens of millions of dollars in fees while investor distributions ceased.

3.      Plaintiffs bring this action to hold Defendants accountable and hopefully recover

for their substantial losses.

## PARTIES

4.      Dr. Kwansoo Lee is a licensed dentist that works and resides in Washington.

5.      Kwansoo Lee, DDS, PLLC is a Washington professional limited liability company owned by Dr. Lee and a buyer of investments at issue herein.

6.      Dr. Brian Chu is a licensed dentist that works and resides in California.

7.      Brian Chu, DDS, Inc. is a California corporation owned by Dr. Chu and a buyer of investments at issue herein.

8.      Dr. Todd Auerbach is a licensed dentist that works and resides in California.

9.      Via Cristal Limited Partnership is an Arizona limited partnership, of which Dr. Auerbach is a general partner, and a buyer of investments at issue herein.

10.      Dr. Chase Funk is a licensed dentist that works and resides in Idaho.

11.      Mint Dental Care, PLLC is an Idaho professional limited liability company owned by Dr. Funk and a buyer of investments at issue herein.

12.      Dr. Kaya Aygen is a licensed dentist that works and resides in Florida.

13.      Kayamerica Dental, PLLC[1] is a Florida professional limited liability company owned by Dr. Aygen and a buyer of investments at issue herein.

14.      Dr. Raymond Jone is a licensed dentist that works and resides in California.

15.      Water Stations LLC is a California limited liability company owned by Dr. Jone and a buyer of investments at issue herein.

16.      Dr. Paul Etchison is a licensed dentist that works and resides in Illinois.

17.      10N, LLC is an Illinois limited liability company owned by Dr. Etchison and a buyer of investments at issue herein.

18.      Dr. Jung Lee is a licensed dentist that works and resides in Washington.

---

[1] Kayamerica Dental, PLLC was known as Sarasota Dental Arts, PLLC until May 16, 2023. Kayamerica Dental, PLLC bought the investments at issue herein as Sarasota Dental Arts, PLLC.

19.    Jung J Lee Waterstation LLC is a Washington limited liability company owned by Dr. Lee and a buyer of investments at issue herein.

20.    John Miranda is a resident of Texas and a buyer of investments at issue herein.

21.    Dr. Nicholas Geller is a licensed dentist that works and resides in Minnesota.

22.    Prestige Fund A II, LLC is a Pennsylvania limited liability company.

23.    Prestige Fund A, IV, LLC is a Delaware limited liability company.

24.    Prestige Fund A V, LLC is a Delaware limited liability company.

25.    Prestige Fund A VI, LLC is a Delaware limited liability company.

26.    Prestige Fund D III, LLC is a Delaware limited liability company.

27.    Prestige Fund D IV, LLC is a Delaware limited liability company.

28.    Prestige Fund D V, LLC is a Delaware limited liability company.

29.    Prestige Fund D VI, LLC is a Delaware limited liability company.

30.    David Zook is a resident of Pennsylvania. Zook has held various positions at Prestige Investment Group, including Principal, Fund Manager, and Executive Vice President of Development. Zook also owns The Real Asset Investor, LLC.

31.    The Real Asset Investor, LLC is a Wyoming limited liability company registered to do business as a foreign limited liability company in Pennsylvania.

## JURISDICTION AND VENUE

32.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, because Plaintiffs allege claims arising under the laws of the United States, and state claims which form part of the same case or controversy.

33.    The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity and the amount in controversy exceeds $75,000.

34.    The Court has personal jurisdiction over Zook because he resides in Gap,

Pennsylvania. The Court has personal jurisdiction over The Real Asset Investor because it maintains its principal place of business in Atglen, Pennsylvania.

35.    Venue is proper within this District pursuant to 28 U.S.C. § 1391 because Zook resides within the District.

## FACTUAL ALLEGATIONS

I.    **Zook and The Real Asset Investor have made millions promoting alternative investment schemes.**

36.    Zook has touted himself as an investment syndicator since at least early 2010.

37.    Zook's syndication ventures grew substantially over time, and he eventually became well known in alternative investment circles

38.    In 2015, Zook founded The Real Asset Investor, LLC. The Real Asset Investor's website[2] describes Zook's business as follows:

| Excerpt From The Real Asset Investor, LLC's Website |
|---|
| The Real Asset Investor is an investment and syndication firm that focuses on providing high yield investment opportunities to its investors by partnering with best-in-class operators across a variety of asset classes. |
| The Real Asset Investor raises capital from accredited investors to acquire assets for cash flow, equity growth, tax benefits, and diversification, giving investors options outside of conventional financial markets. The firm's wide range of investment strategies and asset classes allow investors to find opportunities that are the best fit for their situation while also providing diversification for their portfolios. |

39.    The Real Asset Investor's slogan, as shown below, emphasizes its niche offerings beyond "conventional financial markets":

| Excerpt From The Real Asset Investor, LLC's Website |
|---|

---

[2] *See* www.therealassetinvestor.com (last accessed October 2025).



40.     The Real Asset Investor's website touts the fact that Zook "and his investors have invested across various asset classes since 2015," including investments in oil & gas and blockchain assets.

41.     The Real Asset Investor's website omits, however, that an increasing number of the alternative investment schemes recommended by Zook have produced catastrophic results for his clients.

42.     One such investment opportunity involves Clean Energy Technology Association ("CETA").

43.     CETA claimed to be a profitable manufacturer of patented carbon-capture technology that it leased to major companies such  as ExxonMobil.[3] Zook and The Real Asset Investor helped raise over $39 million in investment capital for CETA.[4] As one of CETA's syndicators, Zook made a net profit of over $7 million.[5]

44.     The CETA investment opportunity turned out to be a fraud.

---

[3] *See* Brett Sholtis, *ATM Investment Promoter Dave Zook Also Led Lancaster Investors to Texas Ponzi Scheme*, LancasterOnline (May 22, 2025), www.lancasteronline.com/news/local/atm-investment-promoter-dave-zook-also-led-lancaster-investors-to-texas-ponzischeme/article_e3772e61-b865-4062-a952-581623d74c67.html (last accessed October 2025).

[4] Ex. F to Status Report of Receiver, Dkt 119-6, *SEC v. Hill*, No. 6:23-cv-00321 (W.D. Tex. May 3, 2023) ("CETA Action").

[5] *Id.*

45.    In May 2023, the U.S. Securities and Exchange Commission filed a complaint against CETA, alleging that CETA had defrauded its investors.[6]

46.    A receiver eventually took control of CETA's assets and determined that it was operating a Ponzi scheme.[7]

47.    CETA's investors lost around $181 million.[8]

## II.    Plaintiffs in this action were solicited by Zook to invest in Prestige, yet another Ponzi scheme.

48.    This action involves Zook's role in soliciting Plaintiffs to invest their savings in yet another Ponzi scheme operated by Prestige Investment Group ("Prestige"), affirming a saying attributed to Mark Twain: "history doesn't repeat itself, but it often rhymes."[9]

49.    Daryl Heller founded Prestige in 2011.

50.    Prestige solicited investments in ATMs in exchange for a share of the revenue received from operation of those ATMs.

51.    Another Heller entity, Paramount Management Group ("Paramount"), purported to manage the installation, operation, and maintenance of the ATMs which were the subject of Prestige's investments.

52.    A website pertaining to one of Prestige's investments,[10] described the ATM investment opportunity as follows:

---

[6] Compl., Dkt 1, CETA Action.

[7] Status Report of Receiver, Dkt 34, CETA Action.

[8] Ex. F to Status Report of Receiver, Dkt 119, CETA Action.

[9] Brian Adams, *History Doesn't Repeat, But It Often Rhymes*, THE HUFFINGTON POST (Jan. 18, 2017).

[10] *See* https://web.archive.org/web/20250619054906/https://prestigefundd.com/ (sourced via online archives, last accessed October 2025).

| Excerpt From Prestige Investment Group's Website |
|---|



53.     In or around 2016, Prestige hired Zook as a fund manager to promote the ATM opportunity to more investors.

54.     In promotional materials for its funds, Prestige promoted Zook as one of only four members of its core team:

| Excerpt From Prestige Investment Group's Promotional Material |
|---|

## Our Team

   

Daryl F Heller CEO
Prestige Investment Group
Founder Paramount Mgt group

Will Powers
Fund Manager
Prestige Investment Group

Jorge Fernandez
Chief Development Officer
Paramount Management Group

Dave Zook CEO at RAI
Principle at Prestige Funds

55.     Zook played a key role in Prestige's  expansion to allow it to bring in more

investors, including Plaintiffs. His direct involvement was touted to investors.

56.     Zook was eventually listed as a manager of various Prestige funds, including funds Plaintiffs invested in.

57.     Plaintiffs were told Zook managed these funds through his company and co-defendant, The Real Asset Investor.

58.     For instance, The Real Asset Investor's employees sent documents containing representations about Prestige's investments to Plaintiffs. The Real Asset Investor's employees gathered Plaintiffs' signatures on documents associated with investments in Prestige, indicating their agreement to invest. The Real Asset Investor's employees also facilitated Plaintiffs' wiring of money in connection with their investments in Prestige.

III.     **Zook played an indispensable role in promoting and recruiting victim investors such as Plaintiffs to invest.**

59.     Since at least 2016, Zook aggressively promoted the opportunity to invest in Prestige to solicit money from new investors, including Plaintiffs.

60.     Zook disseminated promotional materials and recruited new investors.[11]

61.     As part of these promotional efforts, Zook made material representations to investors, including Plaintiffs, about the profitability and security of an investment in Prestige's business.

62.     One example of Zook's promotional material is an online seminar that he hosted in 2022, which featured the slides below. The full presentation is attached to this complaint as

---

[11] On more than one occasion, Prestige and/or Paramount allegedly discovered promotional materials prepared and/or delivered by Zook that contained inaccuracies and/or misrepresentations. Zook refused to remove them and/or alter them to make them accurate. At times, Prestige's and/or Paramount's management informed Zook that Prestige would shut down the Prestige funds that Zook managed if he continued to prepare and/or deliver inaccurate promotional material to solicit additional investments in Prestige. Plaintiffs' investigation is ongoing, and they intend to examine these circumstances in discovery.

**Exhibit A** and incorporated by reference.

| Excerpt From Exhibit A – Real Asset Investor 2022 Presentation |
| --- |

## Investment Details

**Investment:** Diversified and growing Fund 2000 ATMs in 25 States

**Strategy:** Purchase in place ATMs and their contracts, upgrade, optimize and hold for cash flow

**Projected Hold Period:** 7 Years

**Locations:** All over the US with a focus on the North East

**Distributions:** Contractual fixed rate cashflow stream going to investors with manager receiving proceeds after and above that.

| Excerpt From Exhibit A – Real Asset Investor 2022 Presentation |
| --- |

### Investment Details

- **ROI:** Projected annualized cashflow 24.5%
- **IRR:** Projected annualized IRR 18.6%
- **Distribution timing:** Paid monthly
- **Minimum Investment:** $52k
- **506c:** Accredited Investors Only

**Excerpt From Exhibit A – Real Asset Investor 2022 Presentation**

ATM Business
Model #3
With Prestige

- PMG acquires large portfolio's of Institutional grade ATMs
- Acquisitions range from $1M-$25M
- PMG brings ATM portfolio to Prestige
- PMG manages ATMs for Prestige
- PMG shares in the revenue with Prestige
- Prestige funds acquisition through capital raise with its investors
- Investors get a portion of the revenue paid monthly

**Excerpt From Exhibit A – Real Asset Investor 2022 Presentation**

## Prestige Fund D

- Unique opportunity to invest in a Manager whose Portfolio Companies (including this Fund), are a top 5 owner and operator of ATMs in the U.S. with ATMs across 25 states.
- **The Portfolio Companies' portfolio is institutional quality both in size and average retailer location quality, as it has included ATMs located in many well-known retailers including Walgreens, McDonald's, Walmart, Sam's Club, Exxon, Sunoco, and Texaco, as well as many other Fortune 500 firms.**
- Prestige Investment Group, the Manager of this Fund, launched its first ATM fund in 2011. Since then, they have raised a total of more than $200 million of equity and have purchased or managed more than 10,000 ATMs.
- The contractual fixed-rate payments provide investors with a projected 24.5% cash-on-cash return, paid monthly, and an overall projected IRR of 18.6%.
- **Investors are projected to receive 100% of their initial investment back within approximately four years, creating a significant reduction in risk, particularly related to technology disruption.**
- Despite the outsized projected returns, the Fund will not use any leverage (debt financing), thus reducing the investment's risk profile.

63.    Zook, or others at The Real Asset Investor under his direction, also provided potential investors with documents summarizing Prestige's investments, excerpts of which are

shown below. The full document is attached to this complaint as **Exhibit B** and incorporated by reference.

| Excerpt From Exhibit B – Real Asset Investor Material |
|---|

*Collateral/Security/Risk Management...* The investment is backed with a hard asset (ATM Title) that has long usable life cycles. Additionally, we have negotiated assignment of the location agreements (where ATM is placed) in the event of a default by a management company we have contracted which have substantial market valuation thereby mitigating risk.

*ATM Deployment Cycles...* Deployment cycles generally take 65-75 days until ATMs are installed and operational at retail merchant location and will play out as follows. Capital is wired to the management company we contract on or around the 20th of each month. ATMs are then procured and shipped to warehouse by the management company. ATMs are then staged (upgraded to bank standard vaults, wraps installed, programmed for user options, implemented with monetization technology, etc.). ATMs are then shipped to a geo-specific warehouse where the installation company will pick up to install. Subsequent to installation, PFD VI receives Bill of Sales inclusive of an ATM's serial number.

| Excerpt From Exhibit B – Real Asset Investor Material |
|---|

How soon after I invest do my distributions start?

ATM orders get turned in around the 15th of each month, from that day forward we have 75 days to order your machines and place them in service. The first full month after that is when your machines are producing and building cashflow, you will then receive an email on the 25th day of the following month with your investor statement and notification that a deposit has been made into your account via ACH. If the 25th is on a weekend this process will be delayed until the following Monday. It's therefore best to assume that there will be an approximate 4 month delay between when you invest and when you will receive your first distribution.

What happens if an ATM stops performing as well as it should?

The management company will go in, remove the machine and put it in a new location at no charge to the investor and there will be no lapse or reduction in the distribution amount. Remember you are in a blended pool with more than 1000 other ATMs and you are receiving a blended return.

How does an investor get paid? Percentage of profit? Percentage of fees?

Our management company commits to each investor that each unit ($104,000 investment) is projected to receive $2,162 per month. Investors get paid on a blended performance of the entire fund and in the rare occasion that the fund performance is lagging, management will share their portion of the revenue to bring the distribution up to the proforma amount. In the event that the fund over performs, management retains the revenue above the fixed investor return.

| **Excerpt From Exhibit B – Real Asset Investor Material** |
| --- |

**ATM MODEL OVERVIEW**

Our core strategy is to participate in the mature and stable ATM space that has historically demonstrated strong operating margins. By accessing attractive real estate locations for ATMs, we also strategically position for capitalizing on next generation revenue opportunities through advertising monetization of ATM assets/location, thereby augmenting the core healthy surcharge operating margins.

*ATM Ownership...* PFD VI owns the ATM assets and outsources the placement and management of ATMs to a qualified, third-party management company through "best in class" negotiated commercial agreements. These types of contracts have been historically owned and controlled by private equity or hedge funds that are attracted to this sector due to ATMs strong operating margins, and the tangible collateral of the hard-asset title to the ATM. A third-party management company may be an affiliate of PFD VI or its affiliates.

64.    Zook also promoted Prestige's investments through an organization called High Speed Alliance ("HSA"), for which Zook and his company were listed as "sponsors."

65.    Drs. Kwansoo Lee, Chu, Auerbach, Funk, Aygen, Jone, and Jung Lee were members of HSA.

66.    On information and belief, Zook provided, or directed someone to provide, HSA with materials promoting Prestige's investments which were included in materials distributed to HSA members, including the Plaintiffs listed above. One example of such materials is attached to this complaint as **Exhibit C** and incorporated by reference.

67.    These materials promoted Zook as "One of the Top 5 ATM operators in the country."[12]

---

[12] Ex. C at 48.

68.     These materials also represented that Prestige investors "own[ed] the [underlying] ATM assets and [that] the Company outsource[d] the placement and management of ATMs with qualified management companies through 'best in class' negotiated ATM Management Agreements."[13]

69.     In or around July 2018, Zook promoted investments in Prestige at an HSA conference in Destin, Florida.[14]

70.     At this event, Zook represented that Prestige had "hit every proforma since 2011," was run by "well respected businessmen," and provided investors with "cash flow well into the double digits." Zook also represented Prestige's investments as providing its investors with significant tax benefits. Plaintiff Auerbach heard and relied on these statements and/or substantially similar statements in making their decision to invest.

71.     On or around July 25, 2020, Zook promoted Prestige's investments at another virtual conference organized for HSA's members.[15]

72.     At this event, Zook told HSA's members that they would "get a certain amount of transactions, 3,373 transactions. Your portion of the surcharge revenue is 63 cents, giving you $2,125 per month, which is a 24-and-a-half percent cash-on-return."[16] At least Plaintiffs Via Cristal Limited Partnership and Water Stations LLC, and their principals Plaintiffs Dr. Todd Auerbach and Dr. Raymond Jone, heard and relied on these statements and/or substantially similar statements in making their decision to invest and/or continuing to maintain their investments.

73.     Zook also promoted Prestige's investments on a subsequent September 2020

---

[13] *Id.* at 49.

[14] A recording of this presentation is available at
https://vimeo.com/showcase/9143868?video=291821529 (last accessed October 2025).

[15] A recording of this presentation is  at  https://vimeo.com/showcase/9143868?video=445547148. A transcription of this event is also attached as **Exhibit D** to this complaint .

[16] Ex. D at 6:4-7:4.

HSA webinar.[17]

74.     During this webinar, Zook represented that Prestige's investments had "[s]trong cash flow, cash flow well into the double digits," and its investors would be "taking ownership of those – those ATMs."[18] Zook also represented that Prestige had "very predictable cash flow with no volatility" because:

> [W]e commit to you a specific number of transactions at a specific surcharge -- you know, so much per transaction. And so there's been no volatility in the fund. We cover the upside. We take the -- you know, we take the upside if there's some. We cover the downside if there's some. So we sort of act as the -- we take the brunt of the volatility.[19]

At least Plaintiffs Kwansoo Lee, DDS, PLLC, Brian Chu, DDS, Inc., and Water Stations LLC and their principals Plaintiffs Drs. Kwansoo Lee, Brian Chu, and Raymond Jone heard and relied on these statements and/or substantially similar statements in making their decision to invest and/or continuing to maintain their investments.

75.     On or around December 14, 2021, Zook promoted Prestige's investments on yet another HSA webinar.[20]

76.     During this webinar, Zook was asked "[D]o you know the number of ATMs that you've got out on the street?" to which he responded: "So we are approaching 12-ish. I know when we entered -- this last 6 or 8 weeks of the year it's always -- you know, it heats up a lot. And I know entering that we were -- you know, we were above 10,000, so I'm guessing we're somewhere near the 11,500 to 13,000 range right now. I'm not positive, but it's somewhere in that area."[21] At least Plaintiffs Dr. Brian Chu, DDS, Inc., Kayamerica Dental PLLC, Jung J Lee

---

[17] A recording of this webinar is available  at   https://vimeo.com/454045128/bca74a5922. A transcription of this event is also attached as **Exhibit E** to this complaint.

[18] Ex. E at 30:6-7, 32:17-18.

[19] *Id.* at 32:20-33:3.

[20] A recording of this webinar is available  at   https://vimeo.com/657031955/e42e34b2ee. A transcription of this event is also attached as **Exhibit F** to this complaint.

[21] Ex. F at 22:10-20.

Waterstation LLC and their principals Plaintiffs Dr. Brian Chu, Dr. Kaya Aygen, and Dr. Jung Lee heard and relied on these statements and/or substantially similar statements in making their decision to invest and/or continuing to maintain their investments.

77.    On or around January 11, 2022, Zook promoted Prestige's investments on yet an HSA webinar.[22]

78.    During this webinar, Zook promoted Prestige's investments as having "very high cash on cash return … around 24 and a half percent  cash on cash return" and offering investors "the opportunity to invest and take direct ownership on the ATMs." At least Plaintiffs Dr. Brian Chu, DDS, Inc., Kayamerica Dental PLLC, Jung J Lee Waterstation LLC and their principals Plaintiffs Dr. Brian Chu, Dr. Kaya Aygen, and Dr. Jung Lee  heard and relied on these statements and/or substantially similar statements in making their decision to invest and/or continuing to maintain their investments.

79.    Separate and apart from these HSA-specific presentations, Zook also promoted Prestige's investments widely on the internet through his company, The Real Asset Investor.

80.    On or about July 13, 2023, The Real Asset Investor hosted a webinar for Prestige investors brought on by Zook, including Plaintiffs.[23]

81.    The call featured Zook and his "long-time friend and partner Daryl Heller."[24] The below statements about the investment were made to HSA's members during the webinar. At least Plaintiffs Brian Chu, DDS, Inc., Dr. Brian Chu, Kayamerica Dental PLLC, Dr. Kaya Aygen, Via Cristal Limited Partnership, Dr. Todd Auerbach, Water Stations LLC, Dr. Raymond Jone, and John Miranda heard and relied on these statements and/or substantially similar

---

[22] A recording of this webinar is available at https://vimeo.com/665201289/f686311901 (last accessed October 2025).

[23] A recording of that webinar is available at https://www.youtube.com/watch?v=WAE0HwaOya8&list=PLr6hzj2D7Gc-5PDT_uDgpSiY48liIjrXG. A transcription of this event is also attached as **Exhibit G** to this complaint.

[24] Ex. G at 2:6-7.

statements in making their decision to invest and/or continuing to maintain their investments:

    a.  That Prestige conducted considerable due diligence, including "semi-annual and annual and bi-annual audits being done" by a sponsor bank on the relevant financial, operational, compliance-related, and process/system-related aspects of Paramount to ensure it was 'fundamentally sound' as "a best-in-class operator;"[25]

    b.  That Paramount had "been through [third-party bank] audits" and was "passing with flying colors;"[26]

    c.  That the sponsor bank was "seeing every transaction that goes through … so they're able to see every transaction that happens, and it would be very hard for an independent ATM operator to pull shenanigans with the way that the – with the way that the transactions run;"[27]

    d.  That "[The Real Asset Investor] has looked at their ATMs and has looked at the transactions occurring with their ATMs and, you know, just to kind of do a litmus test on the – are they averaging, what the average is projected in the portfolio, et cetera."[28]

82.    On or around August 2, 2023, Zook, through The Real Asset Investor, sent an email to investors, including some or all of the Plaintiffs, with the subject line "ATM Fund – August Tranche is OPEN!" The email included a link to the July 13, 2023 webinar, and to an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint. At least Plaintiffs Brian Chu, DDS, Inc., Dr. Brian Chu, Kayamerica Dental PLLC, Dr. Kaya Aygen, Via Cristal Limited Partnership, Dr. Todd Auerbach, Water Stations

---

[25] *Id.* at 16:10-18.

[26] *Id.* at 17:2-4.

[27] *Id.* at 17:8-12.

[28] *Id.* at 17:17-22

LLC, Dr. Raymond Jone, and John Miranda heard and relied on these statements and/or substantially similar statements in making their decision to invest and/or continuing to maintain their investments

83.     On or around November 2, 2023, Zook, through The Real Asset Investor, sent an email to investors, including some or all of the Plaintiffs, with the subject line "Special ATM Offering – Promotion Extending into November!" The email again included a link to the July 13, 2023 webinar, and to an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint. The email also promised, for every $104,000 invested in Prestige, $188,094 would be paid in returns. Plaintiff Auerbach heard and relied on these statements and/or substantially similar statements in making their decision to invest.

84.     Zook also promoted Prestige's investments through appearance on many different podcasts, two examples of which are below.

85.     In a podcast titled "Amazon is Selling $20K Houses, ATM Investing for Strong Cash Flow," dated on or about June 17, 2019, Zook represented that an investment of $104,000 in Prestige "gets you 7 ATM machines" and that the ATMs were a "vehicle" to get investors "a cash flow stream and a tax benefit."[29] Plaintiff Miranda heard and relied on these statements and/or substantially similar statements in making their decision to invest.

86.     Zook also represented that Prestige had "really strong cash on cash returns … 24 and a half percent … [or] $2,125 monthly" which had "no volatility" because Prestige's management team "commits to the investor that every month you're gonna get 3,373 transactions, for each of those transactions your portion of the surcharge revenue is 63 cents" and if transactions fell below that guarantee, "management kicks in a portion of their surcharge revenue to bring you up to 3,373." As such, Zook represented, "we made it so that we take the brunt of that volatility and it does not flow through to the investors." Plaintiff Miranda heard

---

[29] *See* recording available at https://getricheducation.com/episode/245-amazon-is-selling-20k-houses-atm-investing-for-strong-cash-flow/ (last accessed October 2025).

and relied on these statements and/or substantially similar statements in making their decision to invest.

87.     In a podcast titled "Millions With ATM's with Dave Zook," dated on or about October 6, 2021, Zook represented that Prestige and/or Paramount was "buying [ATMs] by the container load … directly from the manufacture" in connection with investments in Prestige.[30] Plaintiffs Miranda and Jone heard and relied on these statements and/or substantially similar statements in making their decision to invest.

88.     Zook also represented during the podcast that the way investors made money was that they "share in a portion of [] surcharge revenue" from the ATMs invested in. "We tried to make it consistent for an investor that they can know that they're going to get their projected amount every month, so we bear the brunt of the volatility in the fund … we would dip into our portion of the surcharge revenue to bring" investors up to the promised monthly return.

**IV.     Plaintiffs reasonably relied on Zook's statements in making the decision to invest.**

89.     In addition to the representations made by Zook and The Real Asset Investor outlined above, or representations substantially similar to such representations, Zook made numerous representations about Prestige via documents he supplied, or others supplied on his behalf, to Plaintiffs in connection with Plaintiffs' investments, including a Private Placement Memorandum ("PPM").

90.     For instance, the PPM provided to each Plaintiff described the way each of the Funds functioned. The PPM relevant to each of the Funds stated, in the same or materially similar language, that each fund "intends to utilize the entirety of an Investor's capital to purchase, in the Fund's name, as many ATMs as is it can. The Fund shall be solely and exclusively responsible for the installation, operation, and maintenance of the new or used

---

[30] *See* recording available at https://creators.spotify.com/pod/profile/bailey-kramer0/episodes/Millions-With-ATMs-with-Dave-Zook-e1875pj (last accessed October 2025).

ATMs purchased with an Investor's capital."

91.    Each PPM additionally noted "As a matter of practice, the Fund will not issue an Interest to an Investor if, before doing so, it has knowledge that it or a third-party service provider would be unable to source ATMs on the Fund's behalf using the Investor's monies."

92.    Each PPM additionally described Zook as a manager of each of the Funds with a degree of ownership interest that entitled him to compensation in proportion to his interest in the fund.

93.    In connection with their investments in Prestige, Plaintiffs each reviewed materials promoting Prestige's investments containing representations made directly by or attributable to Zook, including but not limited to those set forth below.

94.    Without limitation, Dr. Kwansoo Lee attended the September 1, 2020 and December 14, 2021 HSA webinars identified above. Dr. Lee received an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint in or around September 2020. Dr. Lee discussed Prestige's investments with Zook by phone in or around September 2020, wherein Zook made representations similar to those in the HSA webinars and ATM investment summary. Dr Lee also received a PPM related to his investments. Dr. Lee reasonably relied on these materials in making his decision to invest.

95.    Without limitation, Dr. Brian Chu received an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint in or around August 2021. Dr. Chu attended the December 14, 2021, and January 11, 2022 HSA webinars. Dr. Chu received a PPM related to his investments. Dr. Chu also attended the July 13, 2023 webinar hosted by The Real Asset Investor and received Zook's August 2, 2023 and November 2, 2023 emails, each attaching an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint and linking to the July 13 webinar described above. Dr. Chu reasonably relied on these materials in making his decision to invest.

96.    Without limitation, Dr. Todd Auerbach attended the September 1, 2020,

December 14, 2021, and January 11, 2022 HSA webinars. Dr Auerbach also attended the July 2018 and July 25, 2020 HSA conferences. He received an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint in or around December 3, 2019. He received a PPM related to his investments. Dr. Auerbach also received an email from Zook, through The Real Asset Investor, on or around December 14, 2023 with the subject line "Last Chance For 2023 ATM Bonus Depreciation," linking to the July 13, 2023 webinar hosted by The Real Asset Investor. Upon receiving that email and prior to making his second investment in Prestige, Dr. Auerbach viewed an archived copy of the July 13 webinar. Dr. Auerbach reasonably relied on these materials in making his decision to invest.

97.     Without limitation, Dr. Chase Funk was pitched Prestige's ATM investments by Zook prior to the summer of 2022. He later attended a meeting in Park City in the summer of 2022, during which Zook promoted Prestige's ATM investments. At that meeting, Zook described the investment as essentially "plug it in," representing that for an initial investment of approximately $104,000 an investor could expect monthly payments of about $2,100 over a seven-year period, with the option to leverage investments through certain qualified lending institutions. Zook further represented that Prestige's investments offered "strong cashflow" and "aggressive tax benefits," that the cash flow was "predictable" with "no volatility" because Prestige would "commit" to a specific number of transactions at a set surcharge and cover any downside, and that investors would not "make any money until we get our money back." He also assured attendees there was "no risk" and that Prestige was a "great sponsor." In addition, Dr. Funk reviewed an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint. Dr. Funk reasonably relied on these materials in making his decision to invest.

98.     Without limitation, Dr. Kaya Aygen attended the January 11, 2022 and January 22, 2022 HSA webinars, during which Zook and others presented on ATM investments using glossy pitch materials substantially similar to the attached **Exhibit B**, which included financial

projections showing, for example, that a $104,000 investment could generate 100% bonus depreciation in year one and a 24.7% return. Dr. Aygen also received a PPM related to his ATM investments on or around February 16, 2022. Dr. Aygen also spoke with Zook by phone on or about February 25, 2022, during which Zook described the investments as "clockwork," "no risk," and "guaranteed," with tracking via ATM serial numbers, and in which Zook urged use of personal or business cash and leverage (borrowed money via loans) to invest in Prestige. Dr. Aygen also attended the July 13, 2023 webinar hosted by The Real Asset Investor and received Zook's August 2, 2023 and November 2, 2023 emails, each attaching an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint and linking to the July 13 webinar. Dr. Aygen reasonably relied on these materials in making his investment decision.

99.     Without limitation, Dr. Jone joined HSA on or about June 13, 2020, and attended every HSA webinar and presentation concerning Prestige's ATM investments thereafter, including the September 1, 2020, December 14, 2021, and January 11, 2022 HSA webinars, and July 25, 2020 HSA conference. Dr. Jone also reviewed presentation materials circulated in connection with the July 25, 2020 conference, which included financial projections of 3,373 transactions per month and a portion of the surcharge revenue equal to $0.63 per transaction, yielding a 24.5% cash-on-cash return. Dr. Jone also listened to Zook's podcast appearance on October 6, 2021. Dr. Jone further recalled Zook describing Prestige's operations as "like a military or CIA-level control center" that tracked every transaction in real time and claiming to perform annual or semi-annual diligence visits and audits of the ATM operations. Dr. Jone also received Zook's August 2, 2023 and November 2, 2023 emails, each attaching an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint and linking to the July 13 webinar. Finally, Dr. Jone received a PPM related to his investments in Prestige. Dr. Jone reasonably relied on these materials in making his investment decision.

100.    Without limitation, Dr. Paul Etchison received an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint in or around January 2021 and April 2022. Dr discussed Prestige's investments with Zook via online video call in or around January 2021, wherein Zook made representations similar to those in the ATM investment summary, and received a PPM related to his investments. During Dr. Etchison's January 2021 video call with Zook, Zook represented that investor returns would be "consistent" and "not variable" because Prestige's management would cover any shortfall from their own share of ATM surcharge revenue. Zook further represented that Prestige's guarantee to cover any shortfall served as an incentive to Prestige and/or Paramount to achieve better returns, because in return for covering any shortfall, Prestige and/or Paramount retained any excess above the guaranteed returns to investors. Dr. Etchison reasonably relied on these materials in making his investment decision.

101.    Without limitation, Dr. Jung Lee attended the January 11, 2022 HSA webinar, during which Zook promoted Prestige's investments as offering "very high cash on cash return – around 24 and a half percent return" and the opportunity for investors to "take direct ownership on the ATMs." Influenced by these representations, Dr. Lee made his investment later in 2022. Dr. Lee also received Zook's August 2, 2023 and November 2, 2023 emails, each attaching an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint and linking to the July 13 webinar. Although these emails arrived after his two rounds of investments, they reinforced his belief that Prestige was a legitimate and successful investment. Finally, Dr. Lee received a PPM related to his investments in Prestige. Dr. Jung Lee reasonably relied on these materials in making his investment decision.

102.    Without limitation, Mr. John Miranda received an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint in or around February 2022, discussed Prestige's investments with Zook by phone in or around February 2022, wherein Zook made representations similar to those in the ATM investment summary

and that investors were guaranteed 24.5% cash on cash returns because Prestige's management would cover any shortfall from their own share of ATM surcharge revenue, listened to Zook's podcast appearances on June 17, 2019, and October 6, 2021, and received a PPM related to his investments. Mr. Miranda also received Zook's August 2, 2023 email attaching an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint and linking to the July 13 webinar. Upon receiving that email, Mr. Miranda also viewed an archived copy of the July 13 webinar. Mr. Miranda reasonably relied on these materials in making his investment decision.

103.    Without limitation, Dr. Nick Geller discussed Prestige's investments with Zook by phone in or around November 2021. In that call, Zook represented that (1) Prestige's investors would be paid guaranteed distributions each month, with Prestige's and/or Paramount's management covering any shortfall due to the fund's lagging performance by sharing their portion of ATM surcharge revenue and (2) Prestige's investments were connected to fixed contracts Prestige and/or Paramount had with large retail chains connected to the ATMs being invested in. Based on Dr. Geller's phone conversation with Zook, he understood Zook to be directly involved with the operation and/or management of ATMs connected to Prestige's investments. In or around December 2021, Dr. Geller also received from Zook, or one of his representatives at The Real Asset Investor, an ATM investment summary the same as or materially similar to the one attached as **Exhibit B** to this complaint and a PPM related to his investments. In or around July 2022, Dr. Geller also received from Zook, or one of his representatives at The Real Asset Investor, a bill of sale purporting to provide him the serial numbers of ATMs in Michigan and Indiana purchased with his investments. Dr. Geller reasonably relied on these statements and materials in making his investment decision.

104.    Although the exact wording of Defendants' statements and materials varied, they all contained materially similar representations and assurances about Prestige's investments, including that:

(a)    Money invested in Prestige would be used to purchase ATMs;

(b)    In return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution;

(c)    The value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige; and

(d)    Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

105.    Plaintiffs reasonably assumed the information they had been given about Prestige's investments via these representations had been vetted and was accurate.

106.    In reliance on Zook's representations and assurances, Plaintiffs invested in Prestige in the amounts shown below:

| Plaintiff | Investment Date(s) | Prestige Fund(s) Invested In | Total Amount Invested |
|---|---|---|---|
| Kwansoo Lee, DDS, PLLC | 9/28/2020<br>8/30/2021<br>12/21/2021<br>5/24/2022 | Prestige Fund D III, LLC<br>Prestige Fund A II, LLC<br>Prestige Fund A V, LLC<br>Prestige Fund A V, LLC | $1,764,000 |
| Brian Chu, DDS, Inc. | 8/25/2021<br>11/13/2022 | Prestige Fund A II, LLC<br>Prestige Fund A IV, LLC | $1,040,000 |
| Via Cristal Limited Partnership | 12/29/2018<br>12/26/2023 | Prestige Fund A, LLC<br>Prestige Fund D VI, LLC | $208,000 |
| Mint Dental Care PLLC | 5/31/2023 | Prestige Fund D V, LLC | $208,000 |
| Sarasota Dental Arts PLLC | 4/9/2022<br>8/19/2022 | Prestige Fund A V, LLC<br>Prestige Fund A VI, LLC | $364,000 |

| | 7/28/2021 | Prestige Fund A II, LLC | |
| Water Stations LLC | 11/29/2021 | Prestige Fund A V, LLC | $1,768,000 |
| | 4/14/2022 | Prestige Fund A V, LLC | |
| | 10/7/2022 | Prestige Fund A VI, LLC | |
| 10N, LLC / Paul Etchison | 1/14/2021 | Prestige Fund D, IV, LLC | $728,000 |
| | 5/12/2022 | Prestige Fund D V, LLC | |
| Jung J Lee Waterstations LLC / Jung Lee | 8/20/2021 | Prestige Fund A II, LLC | $624,000 |
| | 11/17/2022 | Prestige Fund A VI, LLC | |
| | 2/15/2022 | Prestige Fund D V, LLC | |
| John Miranda | 4/1/2022 | Prestige Fund D V, LLC | $1,144,000 |
| | 8/22/2022 | Prestige Fund D V, LLC | |
| Nicholas Geller | 12/31/2021 | Prestige Fund A V, LLC | $1,248,000 |
| **Total Invested by Plaintiffs:** | | | **$9,096,000** |

## V.      In 2024, the house of cards collapses.

107.    Plaintiffs also allege in this action that Defendants made actionable representations and omissions as the ATM house of cards collapsed throughout 2024-25 that misled Plaintiffs about the state of affairs and ultimately induced them to hold their positions.

108.    Prestige paid monthly distributions to Plaintiffs through early spring 2024.

109.    However, on April 29, 2024, Prestige announced it would immediately begin paying distributions on a quarterly, rather than the promised monthly, basis.

110.    Prestige announced and justified the change in an email from Heller to Prestige's investors. Heller's email also stated that Zook had been part of conversations surrounding the change to quarterly payments.

111.    In his email, Heller gave only innocuous reasons for the change:

| Excerpt from Heller's E-mail to Plaintiffs |
| --- |

Why are we making the change to quarterly distribution payments?
- Affords opportunity to balance and better account for monthly seasonality impacts
- Provides better alignment on operating cash flow monthly variances
- Better alignment with revenue timing and true ups on payments received from operating vendor/supplier partners
- Significantly reduces administrative costs monthly

112.    Heller's email did not indicate anything was wrong with Prestige's or Paramount's financial condition, or that Prestige's investments were in peril

113.    On May 7, 2024, Zook emailed the Prestige investors who he managed the investments of, including Plaintiffs, following up on Heller's April 29 email:



| Excerpt from Zook's May 6, 2024 E-mail to Plaintiffs |
| --- |

Last week, you received an announcement that the ATM Fund model has been altered from a monthly to a quarterly distribution.

Since that email was distributed, we have received quite a bit of investor feedback and questions.

In the interest of transparency and efficiency, we thought it would be best for Prestige CEO Daryl Heller to address the common questions, themes, and, in some cases, misconceptions in a webinar recording.

We plan on sending out this recording within the next 24 hours.

Thank you.

**Dave Zook**
Investment and Tax Strategist

5075 Lower Valley Road, Atglen, PA 19310
Phone: 717-278-2456  Fax: 610-593-7710
Website: www.therealassetinvestor.com

THE **REAL ASSET INVESTOR**

#1 Best Selling Author

114.    Zook's email, like Heller's, did not indicate anything was wrong with Prestige's or Paramount's financial condition, or that Prestige's investments were in peril.

115.    Prestige never paid investors another distribution following the change to quarterly payments.

116.    In July 2024, Zook began emailing the Prestige investors who he managed the investments of, including Plaintiffs, about actions his legal team was taking against Heller and Paramount.

117.    Zook's emails stated his legal team was "working on behalf of all our ATM investors" and that "we are fully prepared to fight on behalf of our investors."

118.    Zook's emails also stated it was "important to reiterate that I, Dave Zook, hold zero equity ownership in Paramount Management Group."

119.    Zook's emails made no mention of any equity ownership he had in Prestige or its funds or the tens of millions of dollars that Plaintiffs have reason to believe he and other syndicators made from recommending the ATM investment.[31]

120.    In November 2024, Zook emailed the Prestige investors who he managed the investments of, including Plaintiffs, and stated regarding ongoing legal proceedings "our objective is clear: recovery of your investment" and that "[f]rom the time we started the litigation process our #1 goal has always been to bring our investors to safety and to put you in the best position possible, we will continue to fight for you."

121.    Notwithstanding these statements, which were clearly designed to reassure Plaintiffs about the state of their investments, ongoing litigation is revealing what was going on behind the scenes at Prestige and Paramount, unbeknownst to Plaintiffs: Paramount and Prestige operated a massive Ponzi scheme.

122.    In August 2024, Prestige's various funds sued Paramount, demanding payment of past due distributions.[32]

123.    The FBI raided Paramount's offices in December 2024.[33]

---

[31] Daryl Heller's Answer, Affirmative Defenses, and Counterclaims, Dkt 10, at ¶ 147, Adv. Pro. 25-01128-JNP to Heller Bankruptcy.

[32] *See* Compl., *Prestige Fund A, LLC, et al. v. Paramount Management Group, LLC*, No. CI-24-06012 (Pa. Ct. Com. Pl., Aug. 23, 2024) (the "Prestige Fund Action").

[33] *See* Chad Umble, *FBI Agents Appear at Office of Lancaster-based ATM Network that Owes $138M to Investors*, LancasterOnline (Dec. 5, 2024), www.lancasteronline.com/news/local/fbi-agents-appear-

124.    Prestige's funds additionally sued Heller and his company, Heller Capital Group, LLC for fraud.[34]

125.    That suit alleged, among other things, that bills of sale purporting to evidence the purchase of ATMs in connection with Prestige's investments from 2017 to 2023 contained "so-called placeholder numbers, which could not be tied to any particular ATM (i.e., the placeholder number was not the actual serial number of any ATM)" and that even those bills of sale evidenced fewer ATMs than should have been purchased based on the amount of investment in Prestige.[35]

126.    Heller declared bankruptcy in February 2025.[36]

127.    The Court overseeing the Heller bankruptcy also appointed an Examiner to, among other things, "investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity, if any, in the management of the affairs of the Debtor."[37] The Examiner's findings are stunning.

128.    Among other things, Examiner first reviewed 48 invoices for ATMs sold to Prestige funds from 2021 through 2023. The Examiner found that "794 ATM serial numbers appeared on more than one Invoice, indicating that they were sold more than once to separate purchasers in separate transactions. Of those 794 ATMs, 752 ATMs were sold twice, and 42 were sold three times to different Prestige Funds," including many of the Funds on behalf of which Plaintiffs assert derivative claims.[38]

129.    The Examiner next reviewed Paramount's bank statements and monthly gross

---

at-offices-of-lancaster-based-atm-network-that-owes-138m-to-investors/article_85a7f7f6-b321-11ef-9090-9f2ab795cd69.html (last accessed October 2025)

[34] *See* Compl., *Prestige Fund A, LLC, et al. v. Heller et al.*, No. CI-25-00491 (Pa. Ct. Com. Pl., Jan. 24, 2025).

[35] *Id.* at ¶¶ 59-63.

[36] *See In re Heller*, No. 1:25-bk-11354 (JNP) (Bankr. D.N.J. Feb. 11, 2025) (the "Heller Bankruptcy").

[37] First Interim Report of Examiner, Dkt 329, at ¶ 5, Heller Bankruptcy.

[38] *Id.* at ¶¶ 13-16.

profit reports and found that, for every year between 2021 and 2023, Paramount's gross receipts from ATM operations were insufficient to pay returns paid to Prestige's investors.[39]

130.    The Examiner therefore concluded that "With no other available funds to pay returns to earlier Investors, [Paramount] necessarily used funds from subsequent Investors to pay returns owed to earlier Investors. [Paramount]'s obligations to the Funds on account of Investor returns exceeded [Paramount]'s receipts (excluding Investor funds), resulting in substantial cashflow deficits in each year from 2021 through 2023."[40]

131.    The Examiner further found that Paramount should have "been able to purchase roughly 33,898 ATMs with the $587,632,603 received from the Funds" from January 2021 through March 2025 yet from "January 2021 through September 2024, the highest single monthly ATM count … was 17,179 in July 2023."[41]

132.    Finally, based on Plaintiffs' investigation thus far, it has come to light that Zook and other Prestige executives paid themselves before Plaintiffs received their guaranteed distributions, contrary to representations Zook made in promoting Prestige's investments.

133.    Prestige's executives, including Zook, collectively paid themselves around $75 million in connection with the operation of Prestige's investments.[42] On information and belief, Zook, directly or through The Real Asset Investor, was paid approximately $42.7 million of that $75 million. Meanwhile, Prestige's investors have lost millions in connection with their investments in Prestige.

134.    Zook and others at Prestige have also misappropriated revenue generated from ATMs since on or about November 2024 to pay legal fees and other unauthorized expenses

---

[39] *See* Second Interim Report of Examiner, Dkt 473-1 at ¶¶ 79-80, Heller Bankruptcy Action.

[40] *Id.* at ¶ 81.

[41] *Id.* at ¶ 87.

[42] Daryl Heller's Answer, Affirmative Defenses, and Counterclaims, Dkt 10, at ¶ 147, Adv. Pro. 25-01128-JNP to Heller Bankruptcy.

rather than using that money to pay overdue guaranteed distributions to Prestige's investors.[43]

135.    As of this filing, Plaintiffs have lost significant amounts of money in connection with their investments in Prestige, as shown on the next page. The amounts shown below are the losses to Plaintiffs' *principal*, and do not factor in the return on their investment promised by Zook or prejudgment interest.

| Plaintiff | Total Investment Amount | Total Distributions Received | Difference |
|---|---|---|---|
| Kwansoo Lee, DDS, PLLC | $1,764,000 | $824,652 | -$939,348 |
| Brian Chu, DDS, Inc. | $1,040,000 | $362,235 | -$677,765 |
| Via Cristal Limited Partnership | $208,000 | $136,074 | -$71,926 |
| Mint Dental Care PLLC | $208,000 | $76,813 | -$131,187 |
| Sarasota Dental Arts PLLC | $364,000 | $127,020 | -$236,980 |
| Water Stations LLC | $1,768,000 | $658,783 | -$1,109,217 |
| 10N, LLC / Paul Etchison | $728,000 | $392,112 | -$335,888 |

---

[43] *Id.* at ¶¶ 155, 163-66.

| | | | |
|---|---|---|---|
| Jung J Lee Waterstation LLC / Jung Lee | $624,000 | $211,105 | -$412,895 |
| John Miranda | $1,144,000 | $468,812 | -$675,188 |
| Nicholas Geller | $1,248,000 | $668,305 | -$579,695 |
| **Total Loss of Plaintiffs:** | | | **-$5,170,089** |

## VI.    Defendants' knowledge of undisclosed material facts related to Plaintiffs' investments in Prestige.

136.    At all times relevant to this Complaint, Plaintiffs reasonably believed that Zook had the authority to act on behalf of The Real Asset Investor. As such, Zook's statements are imputed to The Real Asset Investor.

137.    Defendants' representations were either false and misleading at the time Defendants made them or subsequently became false and misleading.

138.    Defendants made these representations knowing they were false, or with reckless disregard for their truth.

139.    Plaintiffs continued to rely on Defendants' representations well beyond their making of them because they were fundamental to the way Prestige and Paramount operated on a day-to-day basis. Thus, Defendants' representations remained "alive" in the minds of Plaintiffs as continuing representations.

140.    As such, even if these statements were true when Defendants made them, they obligated themselves to disclose to Plaintiffs additional material facts which they subsequently learned, which if left undisclosed would make these representations false and misleading. In

other words, Defendants' representations to Prestige's investors created an ongoing duty of disclosure of related material facts to update their earlier representations and ensure they were accurate.

141.    On information and belief, subsequent to making the representations set forth above, Defendants had access to and were actually aware of material facts which made these representations false and misleading yet failed to disclose those material facts to Plaintiffs.

142.    On information and belief, Zook received, and thus knew about, the lion's share ($42.7 million) of the excessive $75.6 million in compensation collected by Prestige's management and was receiving payments of these fees before and after Plaintiffs invested in Prestige. He did not disclose this fact to Plaintiffs.

143.    Payments of such exorbitant fees endangered Prestige's ability to pay its investors guaranteed, fixed rate, monthly distributions.

144.    Moreover, payments of such exorbitant fees in light of the fact that Prestige eventually could not pay its investors any distributions beginning in the second quarter of 2024 meant that Zook and Prestige's executives were, contrary to earlier representations, paid before Prestige's investors were paid their guaranteed, fixed rate, monthly distributions through the end of their investments.

145.    In addition, Zook was part of Prestige's leadership who worked in close partnership with Paramount's leadership. He was in a position to know, or he was recklessly indifferent to the fact, that money invested in Prestige by Plaintiffs was not being used to purchase ATMs.

146.    Zook either knew or was recklessly indifferent to the fact that bills of sale purporting to evidence the purchase of ATMs by Paramount between 2017 and 2023 contained placeholder serial numbers which were not traceable to any specific ATM, that bills of sale contained repeated ATM serial numbers, and that even if the bills of sale were accurate, they did not evidence enough ATMs purchased that should have been purchased with the money

invested in Prestige.

147.    In other words, at  least as early as 2017 Zook knew or was recklessly indifferent to the fact that contrary to his representations to Plaintiffs, money invested in Prestige was not being used to purchase ATMs, nor were ATMs and any contracts related to them serving as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Plaintiffs.

148.    Finally, as explained above, Zook knew or was recklessly indifferent to the fact that at least as early as 2021 Paramount's gross receipts from ATM operations were insufficient to pay returns paid to Prestige's investors.

149.    Zook has sworn that he "routinely" spoke with Heller in regard to Prestige and Paramount.[44]

150.    Zook's close relationship with Heller indicates he knew or was recklessly indifferent to how Heller was running Paramount and Prestige.

151.    Moreover, Zook was part of Prestige's leadership team and, as set forth above, represented to Plaintiffs that he had intimate knowledge about how Prestige and Paramount operated, which additionally indicate he knew or was recklessly indifferent to how Heller was running Paramount and Prestige.

152.    At the very least, Zook knew or was recklessly indifferent to how Heller was running Paramount and Prestige.

153.    Despite any suspicions he had about Heller, Paramount, and Prestige's investments, Zook continued to accept additional investments from current investors, including Dr. Auerbach, until at least as late as December 26, 2023.

154.    On information and belief, around the same time, Zook also became aware that Paramount was relying on third-party financing to fund the acquisition of ATMs, which

---

[44] August 22, 2024 Affidavit of Dave Zook, Exhibit 16 to Plaintiffs' Petition for Special Injunction and Preliminary Injunction, p. 2, Prestige Fund Action.

indicated that Prestige investor money was being used for some purpose other than buying ATMs. This was never disclosed.

155.    Moreover, in mid-April 2024, texts between Heller and one of Paramount's executives mentioned above, Randall Leaman, reflect Zook again asking Heller for information about Paramount and/or Prestige's financials.

156.    Heller responded to Leaman by saying that he was providing Zook with only high-level information and that if Zook texted Leaman that Leaman should ignore Zook. Zook did not disclose this fact to Prestige's investors, including Plaintiffs.

157.    Finally, as detailed above, Zook was part of the conversation related to Prestige's changes to quarterly, rather than monthly, payments and was aware or should have been aware that the innocuous reasons Heller gave for the change were false.

158.    These material facts known to Defendants made their earlier representations to Plaintiffs false or misleading.

159.    These materials facts known to Defendants were not known by Plaintiffs nor disclosed to Plaintiffs by Defendants.

160.    Plaintiffs would not have invested in Prestige – and would have taken steps to protect themselves after investing – had these and other material facts been fully disclosed by Defendants.

161.    Unbeknownst to Plaintiffs, Defendants recommended that they invest in Prestige despite the fact that the investment was unsuitable for them given their specific financial goals and circumstances, despite the nature of the risks of the investment including the consequences to them personally in the event they suffered a total loss, and the true financial condition of Prestige and Paramount and the securities at issue.

162.    Defendants had superior access to information about Prestige and Paramount and knew or should have known that the investments were not suitable for Plaintiffs.

163.    Defendants failed to conduct adequate due diligence before recommending that

Plaintiffs invest in Prestige and/or misrepresented the nature and safety of the investments to generate more profits.

164.    Defendants failed to monitor Plaintiffs' investments and otherwise act in Plaintiffs' best interests, both before and after Plaintiffs made their investments.

165.    Defendants' misrepresentations and omissions created a false sense that the investments in Prestige were far safer and more secure than what was actually the case which caused Plaintiffs to invest.

166.    At all relevant times, Plaintiffs reasonably and justifiably relied on Defendants to fulfill their fiduciary duties in connection with his recommendation that Plaintiffs invest in Prestige.

167.    Plaintiffs were thus not aware of the nature of the financial risks they were being exposed to or Zook's lack of due diligence.

## DERIVATIVE ALLEGATIONS

168.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

169.    Plaintiffs assert some of their claims derivatively on behalf of the Funds to redress injuries suffered, or to be suffered, by the Funds as a direct result of the Zook's actions.

170.    Plaintiffs will adequately and fairly represent the interests of the Funds in enforcing and prosecuting their rights.

171.    Plaintiffs have been members of the Funds, as set forth above, continuously during the time of the wrongful conduct alleged herein and continue to be members of the Funds.

172.    A pre-suit demand on the Boards of Managers of the Funds to institute this action would be useless and futile and is therefore excused as a matter of law.

173.    The Funds are manager-managed, not member-managed, by two limited liability companies, both of which Zook and Heller collectively maintain a majority and thus controlling

interest in through their companies The Real Asset Investor and Heller Capital Group, LLC, respectively.

174.    Demand is excused as to Zook and Heller because each of them faces a substantial likelihood of personal liability by reason of the conduct alleged herein. Both Zook and Heller directly authorized, permitted, disregarded, and/or took no steps to prevent the conduct alleged herein, proximately causing substantial losses to the Funds. As a result, Zook and Heller are unable to impartially investigate the conduct and decide whether to pursue action against themselves.

175.    The Funds have been and will continue to be exposed to significant losses due to the conduct alleged herein, yet Zook and Heller have not filed any lawsuits against themselves, individually or collectively, to recover damages for all or part of the harm the Funds have suffered and will continue to suffer.

176.    Under these circumstances, Zook and Heller, as controlling members of the Funds' managers, cannot be expected to bring the claims asserted herein and cannot fully and fairly prosecute such a suit even if they brought one. Demand is therefore excused.

## CAUSES OF ACTION

## COUNT 1

### BREACH OF FIDUCIARY DUTY

(Plaintiffs on behalf of the Funds against Zook)

177.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

178.    As the owner of one of two controlling members of the Funds' managers, Zook owed a fiduciary to the Funds.

179.    Zook breached his fiduciary duty to the Funds by engaging in acts or omissions including:

(a)    Managing the Funds' assets for his excessive personal gain by diverting to himself nearly $42.7 million in fees, which should have and could have been used for the benefit of the Funds, by allowing the Funds to operate as intended and pay guaranteed monthly distributions to the Funds' investors.

(b)    Misappropriating revenue generated from ATMs from on or about November 2024 to pay legal fees and other unauthorized expenses, which should have and could have been used for the benefit of the Funds, by allowing the Funds to operate as intended and pay guaranteed monthly distributions to the Funds' investors.

(c)    By failing to ensure that ATMs which were promised to be purchased with investments in the Funds and placed in the Funds' names were actually purchased, which devalued the Funds.

(d)    Otherwise engaging in grossly negligent or more culpable acts or omissions have devalued the Funds.

180.    As a direct and proximate result of Zook's breaches of his fiduciary duties to the Funds, the Funds have incurred damages.

181.    Plaintiffs, on behalf of the Funds, have no adequate remedy at law.

## COUNT 2

## BREACH OF FIDUCIARY DUTY

(Plaintiffs against Zook and The Real Asset Investor)

182.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

183.    At all relevant times, Defendants were "investment advisers" within the meaning of 15 U.S.C. § 80b-2(a)(11) because both were in the business of directly and/or indirectly providing advice about investments for compensation.

184.    Defendants held themselves out as experienced investment advisors that could help Plaintiffs safely invest to secure their financial freedom.

185.    Defendants had superior knowledge, expertise, and skills about investing that Plaintiffs lacked.

186.    Plaintiffs trusted and relied upon Defendants to act in their best interests.

187.    Under applicable law, Defendants owed fiduciary duties of utmost good faith, loyalty, and care to Plaintiffs, before and after Plaintiffs invested, including, but not limited to, (a) to act in Plaintiffs' best interests and not to act in his own interest to the detriment of Plaintiffs; (b) to recommend investment opportunities that were suitable and secure; (c) to carry out adequate due diligence before providing investment advice; and (d) to disclose all material information related to the risks of the particular investments he recommended to Plaintiffs.

188.    Defendants breached their fiduciary duties to Plaintiffs by, among other things, (a) failing to recommend investments to Plaintiffs that suited Plaintiffs' circumstances and goals; (b) failing to act in Plaintiffs' best interests and failing to refrain from acting in his own interest to the detriment of Plaintiffs; (c) misrepresenting the nature and risks of Prestige's investments to Plaintiffs, and/or failing to carry out adequate due diligence about those investments and/or Prestige's and Paramount's financial condition; and (d) failing to disclose all material information about Prestige and Paramount before and after Plaintiffs invested.

189.    Defendants' breaches of his fiduciary duties to Plaintiffs are continuing and constitute a continuing tort.

190.    Defendants' breaches concealed from Plaintiffs the true nature of their claims against them.

191.    As a direct and proximate result of the above breaches, Plaintiffs have been damaged in an amount to be proven at trial, for which Defendants are liable.

## COUNT 3

## NEGLIGENT MISREPRESENTATION AND OMISSION

(Plaintiffs against Zook and The Real Asset Investor)

192.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

193.    Plaintiffs invested in Prestige based on negligent misrepresentations and omissions of material facts made by Defendants.

194.    At all times relevant to this Complaint, Plaintiffs reasonably believed that Zook had the authority to act on behalf of The Real Asset Investor. As such, Zook's statements are imputed to The Real Asset Investor.

195.    In recommending investing in Prestige to Plaintiffs, Defendants' statements and omissions were material to Plaintiffs' decisions to invest, and maintain their investments, in Prestige.

196.    Defendants' misrepresentations and omissions of material fact include, but are not limited to, that (a) money invested in Prestige would be used to purchase ATMs; (b) in return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution; (c) the value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige; and (d) Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

197.    Defendants failed to take the steps necessary to ensure their representations were correct.

198.    Defendants were in a superior position to know whether their representations were correct and knew or should have known his representations were incorrect.

199.    Plaintiffs were entitled to rely, and did so reasonably, on Defendants'

representations with respect to investing in Prestige.

200.    Plaintiffs were ignorant of the falsity of Defendants' representations.

201.    As a direct and proximate result of the above Plaintiffs have been damaged in an amount to be proven at trial, for which Defendants are liable.

## COUNT 4

### VIOLATIONS OF THE FEDERAL SECURITIES EXCHANGE ACT

(Plaintiffs against Zook and The Real Asset Investor)

202.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

203.    Plaintiffs' investments in Prestige constituted securities under applicable federal law.

204.    At all times relevant to this Complaint, Plaintiffs reasonably believed that Zook had the authority to act on behalf of The Real Asset Investor. As such, Zook's statements are imputed to The Real Asset Investor.

205.    Pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, all material facts in connection with the offer and sale of securities must be disclosed.

206.    Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of the means of interstate commerce, knowingly and/or recklessly made untrue statements of material fact and knowingly and/or recklessly omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in an act, practice, or course of business that would operate a fraud or deceit on another person.

207.    As alleged herein, in recommending that Plaintiffs invest in Prestige, and facilitating their investment, Defendants violated the Securities Exchange Act by making

material misrepresentations and omissions in connection with Plaintiffs' investments in Prestige.

208.    Defendants' misrepresentations and omissions of material fact include, but are not limited to that (a) money invested in Prestige would be used to purchase ATMs; (b) in return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution; (c) the value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige; and (d) Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

209.    Defendants acted knowingly or recklessly in that, among other things, they failed to ascertain and disclose the true facts to Plaintiffs even though those facts were available to them.

210.    Plaintiffs actually and justifiably relied upon the statements and omissions made by Defendants in investing in Prestige and maintaining their investments in Prestige.

211.    Defendants' acts and omissions constituted an extreme departure from the applicable standard of care.

212.    Defendants profited from such conduct through interests in Prestige and/or Paramount.

213.    Defendants were in a superior position to know whether their representations were correct and knew or should have known their representations were incorrect.

214.    Defendants additionally illegally operated as unregistered broker-dealers, which they failed to disclose.

215.    As a direct and proximate result of the above Plaintiffs have been damaged in an amount to be proven at trial, for which Defendants are liable.

## COUNT 5

## VIOLATIONS OF THE PENNSYLVANIA SECURITIES ACT

(Plaintiffs against Zook and The Real Asset Investor)

216.    Plaintiffs reallege and incorporate all allegations of this Complaint as if set forth in full herein.

217.    Zook is a resident and conducts business in Pennsylvania.

218.    The Real Asset Investor is registered to and in fact conducts business in Pennsylvania.

219.    At all times relevant to this Complaint, Plaintiffs reasonably believed that Zook had the authority to act on behalf of The Real Asset Investor. As such, Zook's statements are imputed to The Real Asset Investor.

220.    Plaintiffs' investments in Prestige constituted securities under applicable state law.

221.    Pursuant to Section 1-401 of the Pennsylvania Securities Act of 1972, 70 P.S. § 1-401, it is unlawful to, in connection with the offer, sale, or purchase of any security, (a) employ and device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

222.    Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security in Pennsylvania, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

223.    As alleged herein, in recommending that Plaintiffs invest in Prestige, and facilitating their investment, Defendants violated the Pennsylvania Securities Act by making material misrepresentations and omissions in connection with Plaintiffs' investments in Prestige.

224.    Defendants' misrepresentations and omissions of material fact include, but are not limited to that (a) money invested in Prestige would be used to purchase ATMs; (b) in return for their investments, Prestige's investors would be paid a guaranteed, fixed rate, monthly distribution; (c) the value of the ATMs and any contracts related to those ATMs would serve as collateral in the event of nonpayment of guaranteed, fixed rate, monthly distributions due to Prestige's investors, mitigating the risk of investing in Prestige; and (d) Prestige's management would be paid only after Prestige's investors received their guaranteed, fixed rate monthly distribution.

225.    Defendants acted knowingly or recklessly in that, among other things, he failed to ascertain and disclose the true facts to Plaintiffs even though those facts were available to him. Plaintiffs actually and justifiably relied upon the statements and omissions made by Zook in investing in Prestige and maintaining their investments in Prestige.

226.    Defendants' acts and omissions constituted an extreme departure from the applicable standard of care.

227.    Defendants profited from such conduct through interests in Prestige and/or Paramount.

228.    Defendants were in a superior position to know whether their representations were correct and knew or should have known their representations were incorrect.

229.    Defendants additionally illegally operated as broker-dealers and/or Plaintiffs' investment advisors or agents without proper registration in Pennsylvania, in violation of 70 P.S. § 1-301, and failed to disclose this fact.

230.    Defendants' actions render them liable for civil damages under 70 P.S. § 1-501,

either directly as a person who offers or sells securities or through joint and several liability under 70 P.S. § 1-503 as a person who materially aided in the act or transaction constituting a violation of 70 § 1-501.

231.    As a direct and proximate result of Defendants' various violations alleged herein, Plaintiffs have been damaged in an amount to be proved at trial, for which Defendants are liable.

232.    Plaintiffs are entitled to all rights and remedies provided under Pennsylvania law and Title 70 P.S. Ch. 1.5 *et seq.*

## **JURY DEMAND**

233.    Plaintiffs demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests the Court award the following relief:

A.      For an award of compensatory, consequential, incident, punitive and/or any other damages permitted under applicable law against Zook and The Real Asset Investor, jointly and severally, for Plaintiffs' claims in an amount and of a nature to be determined at trial;

B.      For statutory damages as available and applicable in such amount as the Court deems just and proper, including but not limited to treble, exemplary, and/or punitive damages;

C.      For prejudgment interest on any portion of the damages award that is for a liquidated amount;

D.      For attorneys' fees and costs of litigation; and

E.      For further relief as the Court deems just, equitable, or warranted by law.

Date: October 8, 2025                                  **KLEHR HARRISON HARVEY BRANZBURG LLP**

By: /s/  Jordan M. Rand
Jordan M. Rand
PSBA No. 208671
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Phone: (215) 569-3024
Facsimile: (215) 568-6603
Email: jrand@klehr.com

**K&L GATES LLP**

John T Bender
WSBA No. 49658 (*pro hac vice*)
Aidan D. McCarthy
WSBA No. 63808 (*pro hac vice*)
925 4th Avenue, Suite 2900
Seattle, WA  98104
Phone:  206-623-7580
Facsimile:  206-623-7022
Email:  john.bender@klgates.com

*Attorneys for Plaintiffs Kwansoo Lee, DDS, PLLC, Brian Chu, DDS, Inc., Via Cristal Limited Partnership, Mint Dental Care PLLC, Sarasota Dental Arts PLLC, Water Stations LLC, 10N, LLC, Paul Etchison, Jung J Lee Waterstation LLC, Jung Lee, John Miranda,*

*individually and derivatively on behalf of Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Jordan Rand, certify that I caused a true and correct copy of Plaintiffs' First Amended Complaint to be served on all parties and counsel of record through the Court's ECF Notification System.

Date: October 8, 2025

**KLEHR HARRISON HARVEY BRANZBURG LLP**

By: /s/  Jordan M. Rand            _____
Jordan M. Rand
PSBA No. 208671
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Phone: (215) 569-3024
Facsimile: (215) 568-6603
Email: jrand@klehr.com

K&L GATES LLP

John T Bender
WSBA No. 49658 (*pro hac vice)*
Aidan D. McCarthy
WSBA No. 63808 (*pro hac vice)*
925 4th Avenue, Suite 2900
Seattle, WA  98104
Phone:  206-623-7580
Facsimile:  206-623-7022
Email:  john.bender@klgates.com

*Attorneys for Plaintiffs Kwansoo Lee, DDS, PLLC, Brian Chu, DDS, Inc., Via Cristal Limited Partnership, Mint Dental Care PLLC, Sarasota Dental Arts PLLC, Water Stations LLC, 10N, LLC, Paul Etchison, Jung J Lee Waterstation LLC, Jung Lee, John Miranda, individually and derivatively on behalf of Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC*